UNITED STATES of America, Appellee,

v.

Raymond LEVASSEUR, Carol Ann Manning, Thomas William Manning, Barbara Curzi-Laaman, Richard Charles Williams, Jaan Karl Laaman, Defendants-Appellants.

Nos. 441, 443 to 447.
Dockets 86–1223, 86–1227, 86–1235 to 86–1237 and 86–1243.

United States Court of Appeals, Second Circuit.

Argued Nov. 24, 1986.
Decided April 1, 1987.

Robert J. Boyle, Brooklyn, N.Y., for defendant-appellant Levasseur.

Elizabeth M. Fink, Brooklyn, N.Y., for defendant-appellant Carol Manning.

William M. Kunstler, New York City, for defendant-appellant Thomas Manning.

Margaret L. Ratner, New York City, for defendant-appellant Curzi-Laaman.

Lynne F. Stewart, New York City, for defendant-appellant Williams.

Jesse Berman, New York City, for defendant-appellant Laaman.

John J. Gallagher, Asst. U.S. Atty., Brooklyn, N.Y. (Andrew J. Maloney, U.S. Atty., for E.D.N.Y., Matthew E. Fishbein and Charles E. Rose, Asst. U.S. Attys., Brooklyn, N.Y., of counsel), for appellee.

Before MANSFIELD,* PRATT and ALTIMARI, Circuit Judges.

ALTIMARI, Circuit Judge:

Defendants-appellants seek to overturn various judgments entered by the United States District Court for the Eastern District of New York (I. Leo Glasser, *J.*) on April 28, 29, and 30, and May 2, 1986. The appellants, along with one other co-defendant whose trial had to be adjourned, had been charged in a twelve-count indictment with conspiring to bomb, attempting to bomb, and bombing a series of military offices and buildings used in interstate commerce, in violation of 18 U.S.C. §§ 2, 844(f), and 844(i). After a five-month jury trial, all six appellants were convicted on the conspiracy count; four were convicted on the attempt charge; and individual appellants were found guilty of between two and five completed bombings. The jury acquitted Carol Ann Manning on one bombing count, and was unable to reach a verdict on any of the remaining counts. Judge Glasser sentenced the appellants to consecutive terms of imprisonment on their various convictions, with the following total sentences: fifteen years (Curzi-Laaman and Carol Manning), forty-five years (Le-

vasseur and Williams), and fifty-three years (Laaman and Thomas Manning).

The principal issues raised on appeal pertain to the district court's refusal to suppress various pieces of evidence seized during searches of appellants' houses and cars. One motion was denied in advance of a hearing, and two on the basis of suppression hearing testimony. For reasons explained below, we affirm all convictions.

## BACKGROUND

### A. United Freedom Front: Activities and Investigations

Appellants, along with former co-defendant Patricia Gros, were the subjects of a decade-long, nationwide search prior to their arrests in 1984 and 1985. They were suspects in a variety of crimes for which several underground organizations with which appellants were allegedly affiliated took credit. Among those crimes were eight Boston-area bombings occurring between 1976 and 1979, the murder of a New Jersey State Trooper and the attempted murder of a Massachusetts State Trooper, several other assaults on law enforcement officers, and several armed bank robberies.

The indictment in this case charged appellants with conspiring to bomb and bombing nine buildings (one building twice), and also with an unsuccessful attempt to bomb an additional site. The ten sites were located in the New York metropolitan area and were used either by the military or in interstate commerce. The indictment identified the dates and sites of the completed bombings as follows:

| COUNT | DATE | BUILDING |
|---|---|---|
| 2 | December 16, 1982 | IBM Corp. 600 Mamaroneck Ave. Harrison, N.Y. |
| 3 | December 16, 1982 | South African Airways Procurement Office 1975 Linden Blvd. Elmont, N.Y. |
| 4 | January 29, 1984 | Motorola Corporation 17–22 Whitestone Expressway Queens, N.Y. |

* Judge Mansfield participated in oral argument but died before this opinion was prepared. The remaining judges on the panel have decided this appeal in accordance with Second Circuit Rule § 0.14.

| COUNT | DATE | BUILDING |
|---|---|---|
| 5 | March 19, 1984 | IBM Corp. 3000 Westchester Ave. Harrison, N.Y. |
| 6 | August 22, 1984 | General Electric Corp. Building 1C Huntington Quadrangle Melville, N.Y. |
| 7 | September 26, 1984 | Union Carbide Corp. Old Saw Mill River Road Mount Pleasant, N.Y. |
| 8 | May 12, 1983 | Theodore Roosevelt Jr. Army Reserve Center 101 Oak Street Uniondale, N.Y. |
| 9 | May 13, 1983 | Naval Reserve Center 150-74 6th Avenue Queens, N.Y. |
| 10 | August 21, 1983 | Sgt. John Muller Army Reserve Center 555 East 238th Street Bronx, N.Y. |
| 11 | December 13, 1983 | Navy Recruiting District Office 1975 Hempstead Turnpike East Meadow, N.Y. |

In addition, the indictment charged that the attempted bombing took place on December 14, 1983, at 24–30 Skillman Avenue, Queens, N.Y., a building containing offices of the Honeywell Corporation.

Each bomb was built with dynamite, a pocket watch, a 9-volt battery, black plastic tape, and snap connectors or battery clips. Each explosion was preceded by a warning call and followed by one in a series of consecutively numbered communiques. In the communiques, the United Freedom Front (UFF) claimed responsibility and identified its purported political justifications for the bombings.

Throughout their ten-plus years of underground activities, appellants adopted assumed names, moved repeatedly, and used scanners to monitor police and FBI radio communications. In 1982, for example, Levasseur and the Mannings suddenly deserted their Eastern Pennsylvania residences as law enforcement officials were close to finding them, leaving behind stores of weapons, ammunition, instructions and materials for assembling bombs, and personal belongings.

By the fall of 1984, appellants had moved into several residences in and around Cleveland, Ohio. Their discovery there led numerous FBI agents and law enforcement officials to converge on the area.

On November 3, 1984, former co-defendant Patricia Gros was followed to a Deerfield, Ohio residence she shared with appellant Levasseur, her husband. Agents observed appellant Williams drive away from the Gros-Levasseur residence that evening, and followed him to 4248 West 22nd Street in Cleveland, which turned out to be the residence of appellants Laaman and Curzi-Laaman.

The next morning, November 4th, Levasseur and Gros were arrested when they emerged from their Deerfield farmhouse. That same day, agents surrounded the West 22nd Street house in Cleveland and, using loudspeakers, asked those inside to surrender. Appellants Laaman, Curzi-Laaman, and Williams emerged and were arrested without incident. Several agents from an FBI SWAT team promptly entered the house; one agent later testified that they entered in search of other suspects who may have been lurking inside. The SWAT team members observed, but did not then seize, a total of four weapons on the first and second floors of the house. They turned over the house to a second team of agents who were to occupy the premises until a search warrant arrived. One member of this team discovered in an open basement closet a cannister apparently containing explosive powder and summoned a Cleveland Police Department Bomb Squad detective to examine the cannister. Unlike the weapons previously seen, the cannister was therefore seized before the search warrant arrived the next day.

According to further testimony at the suppression hearing, FBI agents were simultaneously trying to find the Mannings, who were also known to be living near Cleveland. Appellant Williams, according to the testimony of one agent involved in the West 22nd Street arrest, told another agent that he had been on the phone with Carol Manning when he received another incoming call. After placing Carol Manning on hold, he took the other call, which turned out to be from an FBI agent informing the occupants that the house was surrounded. As a result of this fortuity, Williams told the agent, he

was able to advise Carol Manning of the agents' arrival. After his arrest, he told the agent that the Mannings would be long gone, and then provided the agent with their telephone number. From that number, the FBI was able to identify 1885 Dodgeville Road, Jefferson, Ohio, as the Mannings' address. Law enforcement officers converged on that house at approximately 4:00 a.m. the next day (November 5, 1984), in hopes of effecting the Mannings' arrest pursuant to outstanding arrest warrants.

When the agents received no response to their demands that anyone inside the Dodgeville Road house surrender, they entered the fully furnished premises and searched it for hidden occupants. None were found, but agents testified that they saw in plain view four shoulder weapons hanging on a wall, a scanning device tuned to a frequency used by the FBI, and three footlockers, only one of which was locked. Upon a suggestion that the padlocked footlocker might be booby-trapped, a bomb technician opened it and observed that it contained several additional guns with ammunition. None of the items in the Dodgeville Road house was moved, and the premises were secured while the information obtained during the sweep was relayed to officials working on securing a search warrant. The Mannings never returned.

Another agent who had worked on the UFF investigation since late 1982 testified at the suppression hearing that the Mannings had rented the house under the names Steven and Leah Carr. He also discovered that their rent was paid through the end of November 1984.

On November 5, 1984, a search warrant was issued for the houses in Deerfield, Cleveland, and Jefferson. The government submitted with its application for the warrant an affidavit executed by FBI Agent Leonard C. Cross ("the Cross Affidavit"), which summarized information about appellants' activities, gathered by various investigators during the previous ten years. A substantial portion of that information had been obtained through FBI informant Joseph Aceto, who had been involved in numerous activities with appellants during the mid–1970's, in a Massachusetts-based group that came to call itself the Sam Melville-Jonathan Jackson Unit ("the SMJJU"). The Cross Affidavit described Aceto as a protected government witness, an attempted murderer, and a participant in several bombings. Agent Cross did not inform the Magistrate who issued the warrant that Aceto, after receiving witness protection, was convicted and incarcerated for criminal activity in Arkansas, killed another inmate thereafter, received treatment for psychiatric problems, and had a history of drug and alcohol abuse. The Cross Affidavit also relayed much information not obtained from Aceto, including information gathered during the arrests and protective sweeps that had just taken place in the preceeding two days.

After obtaining the search warrant, investigators searched the three Ohio houses and cars parked on the premises. Among the items recovered and introduced at trial were weapons, ammunition, bomb-preparation instructions and materials, copies of UFF communiques, and notebooks containing coded information about the planning, execution, and review of the bombings charged in the indictment.

The Mannings avoided arrest for nearly six months; they finally were found in Norfolk, Virginia in late April 1985. At that time, the government obtained a search warrant for 134 Conway Street, a residence the Mannings had rented on November 16, 1984, using the names Allison S. and Charles Boone. The application for the search warrant, in essence, repeated much of the information contained in the Cross Affidavit and referred to evidence discovered through the searches of the three Ohio residences. Among the items seized at the Mannings' Norfolk house were rent receipts dating back to November 19, 1984, money orders, store receipts, and a November 5, 1984 article about the Ohio arrests. The article had been printed in the Winchester Star, a newspaper apparently distributed only in Virginia.

### B. *Pretrial Motions*

Appellants moved to suppress all physical evidence seized at the Ohio and Virginia residences pursuant to the November 1984 and April 1985 search warrants. In a motion pursuant to *Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978), appellants contested the adequacy of the Cross Affidavit, asserting that it contained knowingly and intentionally false misrepresentations and deliberately misleading omissions about Aceto, that it failed to establish any nexus between the items being sought and the premises to be searched, and that the information presented in the affidavit was stale. In a decision reported at 619 F.Supp. 775 (E.D.N.Y. 1985), Judge Glasser denied the *Franks* motion without a hearing. Judge Glasser rejected appellants' staleness and nexus arguments outright. He further found that most of the alleged inaccuracies were insignificant, and that there was sufficient information untainted by the alleged deficiencies to establish probable cause justifying issuance of the warrant.

The district court held a suppression hearing in connection with motions to suppress evidence discovered in the Laaman/Curzi-Laaman house in Cleveland and from the Mannings' house in Jefferson, prior to issuance of the November 25, 1984 search warrant. Also at issue in the hearing were one small portion of the *Franks* motion—appellants' allegation that the Cross Affidavit inaccurately described the cannister in the Cleveland house as having been in plain view—and a demand to suppress evidence seized from the Mannings' Norfolk, Virginia house under the fruit of the poisonous tree doctrine. In a decision published at 620 F.Supp. 624 (E.D.N.Y. 1985), Judge Glasser first held that the agents and police officers had lawfully entered the Mannings' Jefferson house in view of the outstanding arrest warrants, and then found the warrantless search of the locked footlocker reasonable because the Mannings had abandoned the Jefferson house and thereby ended their reasonable expectations of privacy in the property. *Id.* at 628–31. As an alternative holding, Judge Glasser found the weapons discovered in the locked footlocker admissible under the inevitable discovery exception to the exclusionary rule. *Id.* at 630–31 (citing *Nix v. Williams*, 467 U.S. 431, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984)). In support of this alternative holding, the court found that at the time agents searched the locked footlocker, the government already possessed, and was actively pursuing, lawful means for gaining access to that container. *Id.* (discussing *United States v. Satterfield*, 743 F.2d 827, 846 (11th Cir.1984); *United States v. Alvarez-Porras*, 643 F.2d 54, 63 (2d Cir.1981); *United States v. Griffin*, 502 F.2d 959, 961 (6th Cir.), *cert. denied*, 419 U.S. 1050, 95 S.Ct. 626, 42 L.Ed.2d 645 (1974)).

Finally, in a ruling not contested on appeal, the district court held that items seized from the Laaman/Curzi-Laaman residence in Cleveland were admissible under the plain view doctrine. *See* 618 F.Supp. 1390 (E.D.N.Y.1985). Having credited the agents' testimony that the weapons and the cannister were in plain view, Judge Glasser also denied that portion of the *Franks* motion which challenged this representation in the Cross Affidavit. *See id.* at 1393.

### C. *Trial and Verdicts*

After denying the suppression motions, the district court conducted a five-month jury trial during which the government introduced, among other pieces of evidence, the weapons, bomb-building materials, instruction manuals, maps identifying the bombing sites, and copies of UFF communiques. In addition, the government introduced expert testimony analyzing handwriting, fingerprints, shoeprints, tool marks, explosives, and the coding system allegedly used in the seized documents.

At the close of the government's case, appellants moved to dismiss the charges relating to bombings outside the Eastern District of New York. The district court refused to do so, concluding that because the venue defect was readily apparent on the face of the indictment, appellants had waived their objection by failing to raise it pre-trial. The district court also denied all

Fed.R.Crim.P. 29 motions for judgments of acquittal.

The defense presented several witnesses who testified that harassment by law enforcement officials forced persons sharing appellants' political beliefs to live underground. Appellants also presented testimony from individuals who had called in descriptions of "suspicious" persons seen near the bombings. These witnesses testified that the appellants did not match their descriptions, and that investigators had never followed up on their descriptions. The overall thrust of appellants' case was that they were being tried for their political beliefs rather than for participation in the bombings.

On the thirteenth day of deliberations, the jury began sending notes to Judge Glasser, inquiring about whether and how to report partial verdicts. The exchange of notes and supplemental instructions culminated on the fourteenth day with the jury announcing its wish "to discontinue deliberations and to hand out our verdicts for the [previously specified] counts that we have reached the unanimous decision on." Trial Transcript 11,818. The jury then reported guilty verdicts as to all six appellants, on a total of twenty-seven counts. Overruling a defense objection that the jurors should be allowed to discontinue, Judge Glasser read a modified *Allen* charge and, two hours later, asked each juror whether he or she felt that additional deliberations would enable them to reach decisions on the remaining forty-five counts. When six said yes and six said no, he directed them to continue deliberating. Three days later, Judge Glasser accepted guilty verdicts for two appellants, on a total of five counts, plus a not-guilty verdict for one appellant on one count, and declared a mistrial as to the other thirty-nine counts.

## DISCUSSION

### A. The *Franks* Motion

Under *Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978), a district court may not admit evidence seized pursuant to a warrant if the warrant was based on materially false and misleading information. As the district court correctly observed, materially misleading omissions as well as misrepresentations may be challenged by the defense. *See e.g., United States v. Ferguson*, 758 F.2d 843, 848 (2d Cir.), *cert. denied,* —— U.S. ——, 106 S.Ct. 124, 88 L.Ed.2d 102 (1985).

The *Franks* Court outlined the procedures and standards to be used in trying to balance the defense's right to challenge the sufficiency of the affidavit against the potential for misuse of the privilege as a way to expand the proper scope of discovery. 438 U.S. at 171, 98 S.Ct. at 2684. Specifically, the court held that a defendant would be entitled to a hearing on a challenge to the affidavit only upon a "substantial preliminary showing" that (1) the affidavit contained false statements made knowingly or intentionally, or with reckless disregard for the truth; and (2) the challenged statements or omissions were necessary to the Magistrate's probable cause finding. *Id.* at 171–72, 98 S.Ct. at 2684–85. This court has further explained that under this second requirement, the defense motion must be denied without a hearing if, after setting aside the allegedly misleading statements or omissions, "there remains a residue of independent and lawful information sufficient to support probable cause." *Ferguson*, 758 F.2d at 849.

We agree with the district court's conclusion that the majority of alleged deficiencies in the Cross Affidavit were too insignificant to suggest that agent Cross had deliberately falsified information or shown a reckless disregard for the truth. *See* 619 F.Supp. at 779–82. We also agree with the district court that the failure to outline informant Aceto's full history of pre- and post-cooperation criminal activity, drug and alcohol abuse, and psychiatric problems did not require that there be an evidentiary hearing on the motion. *See id.* at 784–85. This is because, as the district court noted, more than thirty paragraphs in the Cross Affidavit recited detailed information, not obtained from Aceto, about the appellants' criminal activities, about previous discoveries of weapons, ammunition, dynamite and other materials at houses

abandoned by the appellants, and about the then-recent sightings of explosives, weapons, and other evidence in the particular places to be searched. *Id.* at 785–91 (quoting Cross Affidavit ¶¶ 24–54). Those paragraphs provided more than enough "independent and lawful information ... to support [a finding of] probable cause." *Ferguson,* 758 F.2d at 849.

Thus, despite our concern that the Cross Affidavit may have seriously understated the factors that would call into question Aceto's reliability, we conclude that the district court properly denied the *Franks* motion without a hearing.

B. *The Warrantless Footlocker Search*

■ Since one forfeits any reasonable expectation of privacy upon abandoning one's property, a warrantless search or seizure of abandoned property does not violate the fourth amendment. *E.g., Abel v. United States,* 362 U.S. 217, 240–41, 80 S.Ct. 683, 697–98, 4 L.Ed.2d 668 (1960); *United States v. Wilson,* 472 F.2d 901, 902 (9th Cir.), *cert. denied,* 414 U.S. 868, 94 S.Ct. 176, 38 L.Ed.2d 116 (1973). Abandonment is a question of fact, to be decided in objective terms on the basis of all the relevant facts and circumstances, *see, e.g., United States v. Sledge,* 650 F.2d 1075, 1077 (9th Cir.1981); *United States v. Wyler,* 502 F.Supp. 959, 967 (S.D.N.Y.1980), and not on the basis of leasehold interests or other property rights. *Jones v. United States,* 362 U.S. 257, 265–67, 80 S.Ct. 725, 733–34, 4 L.Ed.2d 697 (1960); *United States v. Cella,* 568 F.2d 1266, 1283 (9th Cir.1978); *United States v. Edwards,* 441 F.2d 749, 753 (5th Cir.1971).

■ The facts and circumstances pertinent to the court's abandonment inquiry are not limited to those which were known to the officers at the time of the search or seizure. Rather, subsequently discovered events may support an inference that appellants had already chosen, and manifested their decision, not to return to the property. *E.g., United States v. Callabrass,* 607 F.2d 559, 566 (2d Cir.1979) (Oakes, J., dissenting); *Parman v. United States,* 399 F.2d 559, 565 (D.C.Cir.1968) (Burger, J.).

■ In this case, the district court properly identified and weighed the relevant facts and circumstances in finding abandonment. Among the facts supporting this conclusion are the UFF members' history of living underground and fleeing suddenly as the FBI drew near, plus the Mannings' awareness that the FBI had just surrounded the Cleveland house and arrested their colleagues there. As the district court properly noted, the Mannings' failure to take their weapons, clothing, and personal belongings with them to Virginia does not necessarily indicate that they had intentions of returning to the Jefferson house. Instead, coupled with all the other signs of abandonment, it suggests that they learned of the Cleveland arrests while outside their home, and logically decided that it would be too risky to return to the Jefferson house just to pack. *See* 620 F.Supp. at 630 & n. 1.

Finally, the district court's finding of abandonment is solidly buttressed by the April 1985 discovery of evidence that the Mannings had settled in Norfolk within days of the Ohio arrests. This evidence includes the November 5, 1984 clipping from a locally distributed Winchester, Virginia newspaper, receipts for purchases of household appliances, and the lease and other documents confirming that the Mannings had moved into their Norfolk house by mid-November.

In view of the overwhelming evidence, we affirm the district court's conclusion that the Mannings had forfeited their reasonable expectation of privacy by abandoning their Jefferson house prior to the warrantless search of the footlocker. Because we affirm the denial of the motion to suppress on this ground, we need not reach the district court's alternative holding that this evidence was admissible under the inevitable discovery exception to the exclusionary rule, set forth in *Nix v. Williams,* 467 U.S. 431, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984).

C. *Other Issues*

We have considered the other issues raised on appeal, and find them to be without merit. We briefly set forth our conclusions on several of the claims below.

(top black bars)

First, we agree with the lower court that the indictment gave clear notice of venue defects. Therefore, appellants waived this objection by failing to raise it before trial. *United States v. Price*, 447 F.2d 23, 27 (2d Cir.), *cert. denied*, 404 U.S. 912, 92 S.Ct. 232, 30 L.Ed.2d 186 (1971).

Second, viewing the record evidence in the light most favorable to the government, *e.g.*, *Burks v. United States*, 437 U.S. 1, 17, 98 S.Ct. 2141, 2150, 57 L.Ed.2d 1 (1978); *United States v. LeRoy*, 687 F.2d 610, 616 (2d Cir.1982), *cert. denied*, 459 U.S. 1174, 103 S.Ct. 823, 74 L.Ed.2d 1019 (1983), we must conclude that the evidence was more than sufficient to lead a rational trier of fact to find appellants Carol Manning and Barbara Curzi-Laaman guilty on Counts 8 and 9. Among the evidence supporting the charge that these two appellants aided and abetted those who actually placed the bombs were notebook entries showing that they had helped select the targets, decide on the strength of the explosives, and prepare communiques. The notebooks also quoted Carol Manning as being "thrill[ed] to have women acknowledged." See Trial Transcript 8458–66.

Next, we conclude that Judge Glasser's acceptance of the partial verdicts was entirely consistent with Fed.R.Crim.P. 31(b) and with case law in this circuit. This court has long allowed partial jury verdicts which resolve less than all counts as well as those which resolve all counts against less than all defendants. *See United States v. DiLapi*, 651 F.2d 140, 146–47 (2d Cir.1981), *cert. denied*, 455 U.S. 938, 102 S.Ct. 1427, 71 L.Ed.2d 648 (1982). Appellants' claim that the trial court's conduct in obtaining a partial verdict was "offensively coercive" is totally without merit. The voluminous trial record is a testimonial to the patience, scholarship, and judicial temperament of an outstanding jurist.

Judge Glasser did not abuse his discretion in refusing to declare a mistrial during deliberations when one juror announced that he was scheduled to attend a Naval Reserve meeting at one of the bombing sites, particularly in view of appellants' failure to challenge this juror despite his acknowledgement during voir dire that he was a member of the Naval Reserve.

Finally, we affirm the district court's decision to admit the coded notebooks under Fed.R.Evid. 801(d)(2)(E), 803(24), over appellants' confrontation clause objection. Under *United States v. Paone*, 782 F.2d 386, 391–92 (2d Cir.1986), *petition for cert. pending*, 54 U.S.L.W. 3779 (U.S. May 16, 1986), the notebooks were more than adequately reliable to warrant their admission over a confrontation clause objection. On a related question, we find no error in the district court's decision to allow an FBI agent who had investigated other crimes attributed to the UFF to testify as an expert on the proper interpretation of the coded messages. *See United States v. Farnsworth*, 729 F.2d 1158, 1160–61 (8th Cir.1984); *United States v. Hines*, 696 F.2d 722, 730 (10th Cir.1982); *see also* Fed.R.Evid. 702 advisory committee note (district court has wide discretion in determining whether a witness qualifies as an expert); *United States v. Martino*, 664 F.2d 860, 864 n. 3 (2d Cir.1981) (no error in allowing agents to interpret coded language).

### CONCLUSION

The judgments of conviction entered against appellants are, in all respects, affirmed.