THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
LONNIE L. SMITH, Defendant-Appellant.

Fourth District  No. 4—90—0108

Opinion filed September 20, 1990.

Daniel D. Yuhas and Judith L. Libby, both of State Appellate Defender's Office, of Springfield, for appellant.

Craig H. DeArmond, State's Attorney, of Danville (Kenneth R. Boyle, Robert J. Biderman, and David E. Mannchen, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE STEIGMANN delivered the opinion of the court:

Defendant, Lonnie L. Smith, was convicted by a jury of first degree murder of Tamara Lyn Erwin (Ill. Rev. Stat. 1989, ch. 38, par. 9—1), attempt (first degree murder) of Robert Smith (Ill. Rev. Stat. 1989, ch. 38, par. 8—4), armed robbery (Ill. Rev. Stat. 1989, ch. 38, par. 18—2), armed violence (Ill. Rev. Stat. 1989, ch. 38, par. 33A—2), and aggravated battery (Ill. Rev. Stat. 1989, ch. 38, par. 12—4). The State sought the death penalty, but the jury returned a verdict stating it could not unanimously find that defendant was eligible for the death penalty. Subsequently, the court sentenced defendant on three of his convictions as follows: 60 years for first degree murder, 30 years for attempt (first degree murder), and 30 years for armed robbery, with all sentences ordered to run consecutively. No other sentences were imposed.

On appeal, defendant raises two arguments: (1) the warrantless search of defendant's rented house was unlawful because defendant had not abandoned that residence; and (2) defendant's motion to suppress his admissions should have been granted because those admissions were produced through the exploitation of defendant's "unnecessary detention" after his arrest on a traffic matter.

We affirm.

Because the defendant does not challenge the sufficiency of the evidence to sustain his convictions, we will review the facts of this case only to the extent necessary to put defendant's arguments in context.

The victims in this case both worked at the Monical's pizza restaurant on Bowman Street in Danville. On March 22, 1989, shortly before the restaurant's regular closing time of 11 p.m., a man entered the restaurant and ordered a pizza from the assistant manager, Bob Smith. After Smith prepared the pizza and placed it in the oven, the man pulled a revolver and ordered Smith and Tami Erwin, the other employee present, to go to the area of the restaurant restrooms. The

man then aimed the gun at Smith and after that, Smith remembered nothing about that night except not being able to move when he tried to do so.

The next morning, Smith was found lying on the floor in a pool of blood. The first Danville police officer on the scene found Smith still alive and called for an ambulance. Upon checking the rest of the restaurant, Erwin's body was discovered slumped and leaning against the wall on the stool in the women's restroom.

Erwin's autopsy revealed that her death was due to a bullet wound to her brain. She had also suffered a graze wound to the right side of her head.

The neurosurgeon who treated Smith found bullet wounds above Smith's right ear, to Smith's right lower-ear area, and toward the rear of Smith's head near its base.

Later, at a photo array, Smith identified defendant as the armed robber. In addition to this identification, the State presented other evidence linking defendant to these crimes. Some of this other evidence consisted of admissions defendant made to police investigators and items obtained from a single-family dwelling on Madison Street in Danville in which defendant had been living. Defendant contends that the trial court erred in denying his motions to suppress this evidence.

### I. THE SEARCH OF THE MADISON STREET RESIDENCE

In February 1989, defendant rented a single-family dwelling at 520 East Madison Street in Danville from Henry Robinson. Defendant paid his rent to Robinson in cash on or near the first of February and March. His lease with Robinson was oral and on a month-to-month basis. Robinson had, on one occasion, entered the Madison Street residence while defendant was living there because defendant complained about a leak.

Because Robinson received no rent from defendant for April, Robinson went to the residence, looked in the windows, saw that some of defendant's "stuff" was gone, and guessed that defendant had moved out. Also during April, the police spoke to Robinson and explained to him that they were attempting to contact defendant. They asked Robinson if he had seen defendant recently or knew of some way to contact him. Robinson told the police that he had not seen defendant and that his rent was overdue.

On May 4, 1989, the police again contacted Robinson to inquire if he knew anything about defendant's whereabouts. Robinson told the police that he had not heard from defendant at all and that another month's rent was then due. Danville police officer Jack Smith, Jr.,

then asked Robinson if he had any plans to move defendant out or to go into the Madison Street residence to see if defendant had in fact moved out. Robinson told Smith that he intended to go to the Madison Street residence that day and would allow the officers to enter it. At Smith's request, Robinson signed a form consenting to the police entry.

Robinson testified that after defendant had failed to pay his rent for over 30 days, he "figured I could go in and get ready to rent to someone else." Robinson also testified that he did not think defendant intended to return to that residence based upon what Robinson observed in April when he looked through the windows. On cross-examination, Robinson conceded that he had never served an eviction notice on defendant or tacked such a notice on the door of the house. Robinson never took any legal steps to get defendant out of the house.

When Robinson inspected the residence in April, he noticed that a new padlock and hasp had been installed on the front door of the residence and that the back door was nailed shut. Robinson had no key to the new padlock. On May 4, Robinson broke the padlock, entered the residence, and also permitted the police to enter and search. Upon first entering the residence, Smith testified that there was a foul odor due to what the police later found to be rotting food. They also discovered that the power was turned off. The residence was in complete disarray, and most of the furniture was gone.

On May 10, 1989, in an unrelated traffic case, the defendant executed a recognizance bond and listed his address as 309 North Washington Street in Danville. In a statement he gave to the police on June 19, 1989, regarding the present case, defendant explained that he moved out of the Madison Street residence shortly after the Monical's shooting because his power was cut off.

At the hearing on the motion to suppress, the State argued that defendant had abandoned the Madison Street residence and, accordingly, there was nothing improper in the entry by the police.

Defendant argued that the police entry and search of the Madison Street residence was unlawful because defendant was still the lawful tenant of the premises and Robinson, as defendant's landlord, was without authority to consent to a warrantless search of those premises. Defendant argued against any claim of abandonment, pointing out that a new lock had been installed on the front door. Defendant's counsel characterized the general disarray of the premises as due to defendant being an "untidy bachelor."

The trial court agreed with the State and denied the motion to suppress the items seized from the residence. The trial court observed

that the police had contacted Robinson on perhaps as many as five occasions between early April and May 4 to inquire if Robinson had spoken to defendant. The court noted the spoiled food and garbage found in the premises, and stated that even if defendant was expecting to keep the premises for storage purposes rather than for living purposes, he would certainly have contacted the landlord if he was short of money so that the landlord would not be entering the premises and hauling away any property left behind. In fact, Robinson did clear the place out after the police made their search and disposed of the rest of defendant's property. The trial court concluded its findings as follows:

> "That's what I think any reasonable person would expect [the landlord's disposal of property left behind] if the power is off and you've left food in there and you've got a stinking mess. It's going to attract rats, rodents, and all kinds of bugs. I think there's an abandonment here. I don't think you can say that even though he was living elsewhere, he was keeping this as his warehouse or what have you, with an expectation of privacy, without taking some step to try to extend his tenancy and keep people from going in there, so I feel the evidence does show abandonment and the motion will be denied."

■■ ■ We begin our analysis by discussing both the standard of review and the range of the evidence we may consider. The latter consideration becomes necessary in this case because Robinson, while testifying at trial, was somewhat more expansive in his description of the events surrounding the Madison Street residence than he was in his testimony at the hearing on the motion to suppress evidence. The Illinois Supreme Court had occasion recently to address both of these points of law in *People v. Redd* (1990), 135 Ill. 2d 252, 553 N.E.2d 316, and stated the following:

> "It is the function of the circuit court in a hearing on a motion to suppress evidence to determine the credibility of the witnesses and to resolve any conflict in their testimonies. In reviewing a circuit court's determination on a motion to suppress, the reviewing court may also consider evidence adduced at trial. [Citation.] A reviewing court will not disturb a circuit court's determination on a motion to suppress evidence unless it is manifestly erroneous." *Redd*, 135 Ill. 2d at 289, 553 N.E.2d at 332.

A. *Abandonment of a Fourth Amendment Interest in Premises*

■■ While abandonment of premises is clearly recognized as a ba-

sis upon which to deny a motion to suppress evidence seized from those premises, the courts have disagreed as to the theoretical foundation underlying a finding of abandonment. (1 W. LaFave, Search and Seizure §2.3(a), at 378-79 (2d ed. 1987) (hereafter 1 LaFave, Search and Seizure).) Many courts have held that a defendant who has abandoned the premises in question has no standing to contest a subsequent entry and search of those premises by the police. (1 La-Fave, Search and Seizure at 379.) Others have held that abandonment rests upon the general proposition that the defendant has terminated any justified expectation of privacy. (1 LaFave, Search and Seizure at 379.) Because the analysis on whether abandonment occurred seems to be the same regardless of which of these two theoretical foundations is applicable, we need not attempt at this time to choose between them.

■ In *United States v. Levasseur* (2d Cir. 1987), 816 F.2d 37, the court confronted the issue of abandonment and stated the following:

"Abandonment is a question of fact, to be decided in objective terms on the basis of all the relevant facts and circumstances [citations], and not on the basis of leasehold interests or other property rights." *Levasseur*, 816 F.2d at 44.

■ In *Bloodworth v. State* (1975), 233 Ga. 589, 212 S.E.2d 774, the supreme court of Georgia upheld a finding that the defendant had abandoned the premises in question, his former residence, even though he may have retained a lawful interest in them. (*Bloodworth*, 233 Ga. at 590, 212 S.E.2d at 776.) The court explained as follows:

"The question of abandonment for Fourth Amendment purposes does not turn on strict property concepts but on whether the accused has relinquished his interest in the property to the extent that he no longer has a reasonable expectation of privacy in the premises at the time of the search. [Citations.] This principle has been applied to find abandonment where a tenant has left residential premises even though he may retain the lawful right to possession." *Bloodworth*, 233 Ga. at 590, 212 S.E.2d at 776.

■ In *People v. Morrison* (1978), 196 Colo. 319, 583 P.2d 924, the supreme court of Colorado had before it a case in which the trial court ruled that the defendant had standing to challenge the search, even though it appeared that he had abandoned the apartment in question, because he retained some rights in the apartment based upon his partial payment of the first month's rent. (*Morrison*, 196 Colo. at 322, 583 P.2d at 925.) The supreme court reversed and stated the following:

"Here, even if [defendant] had not formally relinquished all technical indicia of tenancy in the apartment, his actions unequivocally demonstrated that he had abandoned the apartment and had no longer retained any reasonable expectation of privacy in either the apartment or its contents. [Citation.] When he abandoned the apartment, any standing he previously might have had to object to a subsequent search and seizure terminated. [Citation.]

The question of abandonment is 'an ultimate fact or conclusion based generally upon a combination of act and intent.' *Friedman v. United States*, 347 F.2d 697, 704 (8th Cir. 1967)." (*Morrison*, 196 Colo. at 322-23, 583 P.2d at 926.)

The *Morrison* court approvingly quoted *United States v. Wilson* (9th Cir. 1972), 472 F.2d 901, 902, for the following proposition: " 'The proper test for abandonment is not whether all formal property rights have been relinquished, but whether the complaining party retains a reasonable expectation of privacy in the articles alleged to have been abandoned.' " *Morrison*, 196 Colo. at 322 n.1, 583 P.2d at 926 n.1.

In *Commonwealth v. Lanigan* (1981), 12 Mass. App. Ct. 913, 423 N.E.2d 800, the court held that abandonment can be found to have taken place before the end of the rental period because the essence of abandonment is the act of leaving being coupled with the intention of not returning. *Lanigan*, 12 Mass. App. Ct. at 916, 423 N.E.2d at 802.

We cite the foregoing cases because we agree with each and find they help to inform our analysis in the present case as we decide whether the trial court's determination was correct that defendant abandoned the Madison Street residence. These cases also demonstrate the irrelevance of Robinson's failure to take formal legal action to evict defendant on the question of whether defendant abandoned the Madison Street residence. Another case we find instructive on this latter point is *United States v. Wilson* (9th Cir. 1972), 472 F.2d 901. The court in *Wilson* stated the following:

"The district court allowed the motion to suppress all the evidence, in the belief that Arizona landlord-tenant law determined the rights of Wilson and the government. The court reasoned that Wilson had not been lawfully evicted; he retained the right to possession of the apartment; he had standing to object to the search; and, without his consent, the landlord had no right to permit an FBI agent to enter the room. We reverse and remand, because we hold that local law of real property does not provide the exclusive basis upon which to decide

Fourth Amendment questions.

First, the question is not one of standing. The government argued standing, but Wilson had standing to move against the evidence. The crucial question is the legality of the search itself. If the landlord had a right to enter the room, then the initial discovery of the contraband was not illegal. *Abel v. United States*, 362 U.S. 217, 80 S. Ct. 683, 4 L. Ed. 2d 668 (1960). If the property was abandoned, it was seizable. The *Abel* case does not teach that the defendant has no standing to object to a search and seizure of abandoned property, but that '[t]here can be nothing unlawful in the Government's appropriation of such abandoned property.' 362 U.S. at 241, 80 S. Ct. at 698. Search or seizure of abandoned property, even without a warrant, is simply not unreasonable. [Citations.]

The proper test for abandonment is not whether all formal property rights have been relinquished, but whether the complaining party retains a reasonable expectation of privacy in the articles alleged to be abandoned. *Katz v. United States*, 389 U.S. 347, 351, 88 S. Ct. 507, 19 L. Ed. 2d 576 (1967). As Mr. Justice Frankfurter stated in *Jones v. United States*, 362 U.S. 257, 80 S. Ct. 725, 4 L. Ed. 2d 697 (1960):

'*** We are persuaded, however, that it is unnecessary and ill-advised to import into the law surrounding the constitutional right to be free from unreasonable searches and seizures subtle distinctions, developed and refined by the common law in evolving the body of private property law which, more than almost any other branch of law, has been shaped by distinctions whose validity is largely historical ***.' 362 U.S. at 266, 80 S. Ct. at 733.

[Defendant] urges that the rejection of Fourth Amendment distinctions based on property rights is a one-way street: that is, ancient rules of tenure and transfer of property may be rejected to increase, but never to decrease, Fourth Amendment protections. It is more accurate to look to the purpose of the Fourth Amendment. Privacy, rather than hereditaments, has motivated the recent decisions. Cases like *Jones* and *Katz* encourage a functional approach to the Fourth Amendment. The objective is protection of a justifiable expectation of privacy and freedom from governmental intrusion." (*Wilson*, 472 F.2d at 902-03.)

We agree with the foregoing quotation, and we will also apply these concepts to the facts of the present case.

Before both this court and the trial court, defendant makes much of the fact that a hasp and a new padlock, to which Robinson, the landlord, had no key had been put on the front door of the Madison Street residence. Defendant argues that the presence of this new lock defeats any claim by the State that defendant had abandoned the premises. However, as in other contexts, the issue of abandonment should be decided based upon the totality of the circumstances shown by the evidence. While the presence of the new padlock is a factor to be considered, that presence, without more, is not determinative. See *State v. Hodge* (1987), 225 Neb. 94, 102-03, 402 N.W.2d 867, 874 (although defendants left a padlock on the attic door of the premises in question, the evidence nonetheless showed that they had abandoned those premises).

Defendant also makes much of the fact that he had missed only two rental payments, and the second payment by just a few days. However, we note that the degree of delinquency in paying rent is again but one factor to be considered in the totality of circumstances before the trial court. In *State v. Madera* (1983), 206 Mont. 140, 670 P.2d 552, the supreme court of Montana decided a case with facts somewhat similar to the present case. In *Madera*, two men committed an armed robbery on October 3, 1981. As a result of their investigation, the police, on October 5, 1981, began watching defendant LaMere's residence. After observing no activity for three days at that residence, they contacted LaMere's landlord for information about where LaMere might be. When the police told the landlord that LaMere was a suspect in the investigation, the landlord invited the police to join him in entering LaMere's apartment. On these facts, the court stated the following:

> "The detective went into the rental premises on October 7, 1981, in company of the landlord. The curtains had been drawn, no car was parked in front of the residence, there was no response when the landlord knocked on the door, LaMere's key was found inside, and there was garbage, including beer cans, paper sacks, empty cigarette packs, and a box spring and mattress with no bedding on it, lying on the floor. The landlord indicated that the apartment before that had always been neat and clean, and the landlord further stated that 'it looks like their stuff is gone.' The rent was unpaid for the month of October (due October 5) and there was no evidence that LaMere came to the apartment at any time after the robbery occurred or before his arrest on November 6, 1981.

* * *

Clearly, LaMere is not in a position to argue any infringement of his constitutional guarantees against unreasonable search and seizure in this case. He had departed the apartment at the time it was searched. His abandonment of the premises is undoubted. The defendant had disclaimed by his actions any right to object to the place being searched or the things seized." *Madera*, 206 Mont. at 149, 670 P.2d at 557.

■■ Based upon the analyses of the issue of abandonment in all of the foregoing cases, we find that the trial court in the present case did not abuse its discretion by denying the motion to suppress evidence seized from the Madison Street residence. The totality of the circumstances before the court clearly showed that defendant had abandoned this residence. These circumstances include defendant's failure to pay rent for two months, his removal of the vast majority of his belongings from the residence, the garbage and rotting food found within, the general disarray, and the disconnection of the power. That defendant left the house padlocked (assuming that defendant was in fact the person who padlocked the house) is not sufficient to overcome the other factors mentioned.

### B. *Relevancy of Evidence Showing Abandonment After the Police Entry of the Premises in Question*

■■ Before concluding our analysis of the abandonment issue, two additional points must be addressed. The first is the question of whether the court, in deciding whether defendant has abandoned the premises in question, is limited to inquiring into only what the officers knew at the time they crossed the threshold of the premises in question. In almost all other contexts, this is clearly the case. In other words, it is "black-letter law" that an unlawful search cannot be rendered lawful by the discovery of incriminating evidence found as a result of the search, or by other events occurring *after* the search has taken place. The law surrounding the doctrine of abandonment, however, appears to be the exception to this rule. An example of this exception can be found in the *Madera* case, where the court, in focusing on an entry into the allegedly abandoned premises on October 7, 1981, stated the following:

"The rent was unpaid for the month of October (due October 5) and there was no evidence that LaMere came to the apartment at any time after the robbery occurred *or before his arrest on November 6, 1981.*" (Emphasis added.) (*Madera*, 206 Mont. at 149, 670 P.2d at 557.)

Events occurring after October 7 but before November 6 normally

would be irrelevant to the question of the legality of the police entry and search on October 7. In *Madera,* however, such events were deemed relevant.

Also along these same lines is the following language by the Second Circuit Court of Appeals in *Levasseur*:

"The facts and circumstances pertinent to the court's abandonment inquiry are not limited to those which were known to the officers at the time of the search or seizure. Rather, subsequently discovered events may support an inference that appellants had already chosen, and manifested their decision, not to return to the property." *Levasseur,* 816 F.2d at 44.

■■■ We agree with these decisions and hold that, as in the present case, the court may properly consider actions of the defendant which occurred *subsequent* to the police entry of the premises in question, such as the defendant's filling out the recognizance bond form several days later, showing a different address.

## C. *The Application of Illinois v. Rodriguez to Abandonment Issues*

The State has made the following argument to this court: "All of these circumstances would lead a reasonable person to believe that the defendant had vacated or abandoned this house prior to any entry [by the police]." While we have held that the trial court was correct to find abandonment on the facts in this record, the point raised by the State in its brief raises a question that was addressed in a slightly different context by the United States Supreme Court a few months ago in *Illinois v. Rodriguez* (1990), 497 U.S. ___, 111 L. Ed. 2d 148, 110 S. Ct. 2793. Simply framed, that question is the following: If a trial court were to determine that a defendant had not abandoned the premises in question, but that the police officers, based on the totality of the circumstances before them, *reasonably but erroneously* believed the defendant had abandoned those premises, should evidence seized by the police from those premises be suppressed? The Court's analysis in *Rodriguez* suggests that the answer to this question is no.

In *Rodriguez,* the police were summoned by the mother of Gail Fischer, who in turn told the police that Fischer and Rodriguez lived together in a certain apartment in Chicago. (*Rodriguez,* 497 U.S. at ___, 111 L. Ed. 2d at 155, 110 S. Ct. at 2796.) The assistance of the police was requested because Fischer claimed to have been severely beaten by Rodriguez earlier that day in their apartment. (*Rodriguez,* 497 U.S. at ___, 111 L. Ed. 2d at 155-56, 110 S. Ct. at 2797.) Fischer told the police that Rodriguez was then asleep in the apartment,

and she consented to travel there with the police in order to unlock the door with her key so that the officers could enter and arrest Rodriguez. (*Rodriguez*, 497 U.S. at ____, 111 L. Ed. 2d at 155-56, 110 S. Ct. at 2797.) After Fischer unlocked the door and gave the officers permission to enter, they went into the living room, where they observed in plain view drug paraphernalia and containers filled with white powder, later determined to be cocaine. (*Rodriguez*, 497 U.S. at ____, 111 L. Ed. 2d at 156, 110 S. Ct. at 2797.) They found Rodriguez asleep in the bedroom and discovered therein additional containers of cocaine. *Rodriguez*, 497 U.S. at ____, 111 L. Ed. 2d at 156, 110 S. Ct. at 2797.

The motion to suppress the evidence seized from Rodriguez's apartment was granted because the trial court held that at the time Fischer consented to the entry of the police, she had no authority to do so because she had vacated the apartment several weeks earlier. The trial court also rejected the State's contention that even if Fischer did not possess common authority over the premises, there was no fourth amendment violation if the police reasonably believed at the time of their entry that Fischer possessed the authority to consent. (See *Rodriguez*, 497 U.S. at ____, 111 L. Ed. 2d at 156, 110 S. Ct. at 2797.) The Illinois Appellate Court affirmed. See *People v. Rodriguez* (1989), 177 Ill. App. 3d 1154, 550 N.E.2d 65 (unpublished order under Supreme Court Rule 23), *rev'd and remanded* (1990), 497 U.S. ____, 111 L. Ed. 2d 148, 110 S. Ct. 2793.

The United States Supreme Court agreed with the trial court that the State had not met its burden of establishing that Fischer had common authority with Rodriguez over the apartment in question. (*Rodriguez*, 497 U.S. at ____, 111 L. Ed. 2d at 156, 110 S. Ct. at 2797.) The Court reversed the order suppressing the evidence, however, and stated the following:

> "In the present case, the Appellate Court found it unnecessary to determine whether the officers reasonably believed that Fischer had the authority to consent, because it ruled as a matter of law that a reasonable belief could not validate the entry. Since we find that ruling to be in error, we remand for consideration of that question." (*Rodriguez*, 497 U.S. at ____, 111 L. Ed. 2d at 161, 110 S. Ct. at 2801.)

Quoting *Brinegar v. United States* (1949), 338 U.S. 160, 176, 93 L. Ed. 1879, 1891, 69 S. Ct. 1302, 1311, the Court in *Rodriguez* said the following:

> " 'Because many situations which confront officers in the course of executing their duties are more or less ambiguous,

room must be allowed for some mistakes on their part. But the mistakes must be those of reasonable men, acting on facts leading sensibly to their conclusions of probability.' " *Rodriguez*, 497 U.S. at ____, 111 L. Ed. 2d at 159-60, 110 S. Ct. at 2800.

The gist of the holding of the Court in *Rodriguez* is that, "in order to satisfy the 'reasonableness' requirement of the Fourth Amendment, what is generally demanded of the many factual determinations that must regularly be made by agents of the government *** is not that they always be correct, but that they always be reasonable." (*Rodriguez*, 497 U.S. at ____, 111 L. Ed. 2d at 159, 110 S. Ct. at 2800.) We cite this language from *Rodriguez* because we believe it to be fully applicable to a determination of whether a defendant has abandoned premises from which evidence is taken that is the subject of a motion to suppress. We see no principled distinction between a *reasonable but erroneous* belief by the police that a third party had "common authority" with the defendant over the premises in question, and a *reasonable but erroneous* belief by the police that a defendant had abandoned the premises in question. Thus, in the present case, the entry of the police into the Madison Street residence, based upon the circumstances before them and their *reasonable* belief that defendant had abandoned that residence, would have been lawful even if the trial court were later to find that belief to have been erroneous.

## II. MOTION TO SUPPRESS DEFENDANT'S CONFESSIONS

On Sunday, June 18, 1989, defendant was arrested pursuant to a warrant for his failure to appear on a traffic offense. Defendant was held in custody overnight and normally would have been brought into court the next afternoon before the 1:30 p.m. court call. That Monday morning, however, Investigator Larry Rollins of the Danville police department noticed the defendant's name on the book-in sheet, indicating defendant had been arrested the day before. As a result, Rollins went to the Vermilion County jail sometime after 10 a.m. to question defendant about a battery complaint Rollins had received from defendant's girlfriend in which she claimed defendant struck her. Rollins fully informed defendant of all his *Miranda* rights, and defendant agreed to speak to Rollins about the battery complaint. Defendant, using black ink, filled out a written waiver of rights form, indicating his willingness to speak voluntarily to the officer. That form contained a blank space for the insertion of the name of the offense about which the suspect was being interrogated. Rollins

wrote the word "battery" in the blank space.

Rollins' conversation with defendant about the battery complaint lasted about 10 minutes. Rollins then asked defendant if he would be willing to talk about the Monical's case, and defendant stated that he would. Rollins also spoke with Danville Investigator Jack Smith, and, around 11:15 a.m., the two officers began questioning defendant about Monical's. Rollins began this second interrogation by writing on the waiver form—in a different-colored (blue) ink—the words, "armed robbery and murder." He then asked defendant if defendant remembered his rights that they had discussed earlier. Defendant stated he did. Nonetheless, Rollins went over them all again and defendant again executed the waiver form using blue ink, the same color Rollins used to write in "armed robbery and murder." Thereafter, defendant was questioned off and on by Danville police officers about the Monical's case, resulting in two taped statements being given at 8:10 p.m. and 9:22 p.m. that evening. The second statement was more detailed than the earlier statement and amounted to a confession.

Defendant argues he could and should have been brought before the court on the traffic charge at the 1:30 p.m. court call on Monday, June 19. Citing section 109—1(a) of the Code of Criminal Procedure of 1963 (Code) (Ill. Rev. Stat. 1989, ch. 38, par. 109—1(a)), defendant argues that he was entitled upon the traffic charge to be taken without unnecessary delay before the nearest and most accessible judge in Vermilion County. He argues that this should have occurred at 1:30 p.m. that Monday afternoon. Defendant claims that because he was denied his right to a prompt presentment to the court on the traffic matter due to the police investigation of the Monical's murder case, he was, in effect, being illegally held in custody without probable cause on the murder case. Accordingly, while conceding that the record may show he waived his fifth amendment rights under *Miranda*, he nonetheless was being illegally held in violation of the fourth amendment. For that reason, he maintains that his statements and confession should be suppressed as the fruits of this illegality. We disagree.

The evidence at the hearing on the motion to suppress defendant's confession shows that the police officers scrupulously observed all of defendant's procedural rights and complied with all of his requests made while he was in custody and being questioned about the Monical's shootings. Without contradiction, the evidence presented at the hearing on the motion to suppress his statements established that no promises of any kind were ever made to the defendant and he

was told he could stop talking any time he wished. Furthermore, defendant was not questioned continuously, but was given several breaks, during which he was allowed to eat, drink, smoke cigarettes, and use the restroom. Some of these breaks were lengthy.

During the course of the afternoon's questioning, defendant asked if any charges regarding Monical's were going to be brought against him. The police responded that they did not know, that it would be up to the State's Attorney. Defendant asked if that would be Mr. DeArmond, and the police said that was correct. Defendant then requested to speak to DeArmond, and about 3:30 that afternoon, DeArmond appeared in the interrogation room. Defendant asked the State's Attorney if defendant was going to be charged, and the State's Attorney told defendant that he (the State's Attorney) did not know yet. He explained that he had not yet spoken with the investigators. Defendant asked if it would be possible for him to talk to his grandmother, and the State's Attorney said yes, that he would have her contacted immediately. The last thing defendant asked was whether the State's Attorney would consider releasing him or approving or agreeing to his release on bond in another case, and the State's Attorney said no.

Later that afternoon, defendant's grandmother also appeared at the Vermilion County public safety building, and defendant was given an opportunity to speak with her. His grandmother testified at the hearing on the motion to suppress that she was contacted by the police, who told her that her grandson wished to speak to her at the police station. She was given an opportunity to speak with him in private, and she received no instructions by the police before doing so. His grandmother said she started crying when defendant informed her that the police were questioning him about Monical's, and she testified she told defendant she hoped he was not involved in it. The last thing she told defendant in this conversation was that he should tell the truth.

After visiting with his grandmother, defendant began to admit his complicity in the Monical's shootings, but it was not until his second recorded statement at 9:22 p.m. that he fully confessed.

Investigator Smith recalled that defendant wanted to know if he was going to go to court that day in regard to the Monical's case, but Smith did not recall defendant mentioning anything about going to court on the traffic charge. Smith testified that none of the officers discussed with defendant what would happen with regard to the traffic case.

In support of his argument that his statements should be sup-

pressed, defendant relies upon *People v. Quarles* (1980), 88 Ill. App. 3d 340, 410 N.E.2d 497. In *Quarles*, defendant was arrested for attempt (burglary) and placed in custody. The next day, before Quarles was questioned, the interrogating officer became aware that there was no substance to the charge of attempt (burglary) for which defendant was in custody. (*Quarles*, 88 Ill. App. 3d at 341-42, 410 N.E.2d at 498-99.) However, the officer questioned the defendant nonetheless regarding an unrelated burglary. Eventually the defendant confessed to that crime. The appellate court reversed the trial court and deemed defendant's retention in custody, after the police discovered there was no substance to the attempt (burglary) charge, to be the equivalent of an arrest without a warrant and without probable cause. *Quarles*, 88 Ill. App. 3d at 342, 410 N.E.2d at 499.

In our judgment, *Quarles* has no application to the present case. Here, defendant was arrested pursuant to a warrant issued by a judge when defendant failed to appear on a traffic charge. By combining section 109—1(a) of the Code with the *Quarles* case, defendant invites us to find that his continued custody and interrogation by the police after the point at which defendant normally would have been brought into court on the traffic charge is the equivalent to a warrantless arrest regarding the Monical's shooting; further, because the police had no probable cause for that arrest, defendant's confession obtained during this unlawful detention must be suppressed.

We decline defendant's invitation to extend *Quarles* beyond the particular facts of that case. We also decline to extend section 109—1(a) of the Code beyond what the legislature intended and beyond how that section has been construed to date.

■■■ Section 109—1(a) of the Code in pertinent part reads as follows:

> "Person Arrested. (a) A person arrested with or without a warrant shall be taken without unnecessary delay before the nearest and most accessible judge in that county ***." (Ill. Rev. Stat. 1989, ch. 38, par. 109—1(a).)

In *People v. Brooks* (1972), 51 Ill. 2d 156, 281 N.E.2d 326, the Illinois Supreme Court construed this section and stated the following:

> "A delay in presenting the defendants to a judge does not render a statement made by the defendants during this interval inadmissible, but it is a circumstance to be considered in determining the voluntariness of the statement." *Brooks*, 51 Ill. 2d at 165, 281 N.E.2d at 332.

More recently, this court had occasion to construe section 109—1(a):

"The Code requires that once a person is arrested he shall be taken without unnecessary delay before the court to be arraigned. (Ill. Rev. Stat. 1985, ch. 38, par. 109—1(a).) Delay alone, however, is insufficient to penalize the State by excluding incriminating statements obtained during the period between arrest and arraignment. The issue is whether the statements were made voluntarily. Only where the statements are involuntary must they be excluded. Defendant carries the burden to satisfy the trial court of a substantial prejudice as a result of the delay. Only then does the burden shift to the State to demonstrate the reasonableness or necessity of the delay. (*People v. Dees* (1981), 85 Ill. 2d 233, 237-38, 422 N.E.2d 616, 618-19.) Unnecessary delay is only one factor to be considered in determining the voluntariness of an incriminating statement. Seventy-two hours, for example, between the arrest and the arraignment does not *per se* render such a statement involuntary. The question of voluntariness is for the trial court to determine on the totality of the circumstances, and its decision will be reversed only if it is against the manifest weight of the evidence. *People v. Taylor* (1968), 40 Ill. 2d 569, 573-74, 241 N.E.2d 409, 411-12." *People v. Dove* (1986), 147 Ill. App. 3d 659, 667, 498 N.E.2d 279, 284.

Once a defendant in lawful custody has knowingly waived his *Miranda* rights and indicated his willingness to talk to the police, as here, the police are under no obligation under section 109—1(a) of the Code to interrupt their interrogation as long as its length is not unreasonable and the suspect's statements continue to be voluntary. Specifically, we hold that the "delay" involved in taking a voluntary statement from a suspect under these circumstances is "necessary" within the meaning of section 109—1(a).

Defendant also cites *United States v. Wilson* (9th Cir. 1988), 838 F.2d 1081, for the proposition that when the delay in bringing a defendant before a magistrate is not reasonable, the defendant's confession is not voluntary. However, we note that the holding in *Wilson* was premised upon the so-called *McNabb-Mallory* rule (see *McNabb v. United States* (1943), 318 U.S. 332, 87 L. Ed. 819, 63 S. Ct. 608; *Mallory v. United States* (1957), 354 U.S. 449, 1 L. Ed. 2d 1479, 77 S. Ct. 1356), which requires a person in custody to be brought before a judge within six hours immediately following his arrest or other detention. However, this Federal exclusionary rule has never been adopted in this State, and the Illinois Supreme Court in *Brooks* specifically rejected it. (*Brooks*, 51 Ill. 2d at 165, 281 N.E.2d at 332.) As

discussed earlier, *Brooks* stands for the proposition that the delay in presenting a defendant to a judge is merely a circumstance to be considered in determining the voluntariness of his statement.

■■ In *People v. Redd* (1990), 135 Ill. 2d 252, 292-93, 553 N.E.2d 316, 335, the Illinois Supreme Court wrote the following:

"This court has long held 'the question of the competency of a confession is for the trial court alone to decide, and that the court is not required to be convinced of its voluntary character beyond a reasonable doubt when making its decision.' (*People v. Carter* (1968), 39 Ill. 2d 31, 38.) The State has the burden of establishing the voluntariness of a defendant's confession by a preponderance of the evidence. (*People v. King* (1986), 109 Ill. 2d 514, 525; *People v. Caballero* (1984), 102 Ill. 2d 23, 33.) Findings by the circuit court on the question of the voluntariness of a confession will not be disturbed by a court of review unless they are against the manifest weight of the evidence. *People v. Galvin* (1989), 127 Ill. 2d 153, 174; *King*, 109 Ill. 2d at 525; *People v. Davis* (1983), 97 Ill. 2d 1, 20."

■■ Having carefully considered the circumstances surrounding the giving of the defendant's statements in the present case in accordance with the foregoing standards, we agree with the finding of the trial court that those statements were voluntary, and we find no error in the trial court's denial of defendant's motion to suppress.

For the reasons stated, the trial court properly denied both of defendant's motions to suppress evidence. Accordingly, defendant's convictions and sentences are affirmed.

Affirmed.

LUND and GREEN, JJ., concur.