THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. ALLISSA M. LONDON, Defendant-Appellant.

Fifth District    No. 5—02—0666

Opinion filed June 2, 2005.

DONOVAN, P.J., specially concurring.
KUEHN, J., dissenting.

Daniel M. Kirwan and Nancy L. Vincent, both of State Appellate Defender's Office, of Mt. Vernon, for appellant.

Steve Friedel, State's Attorney, of Vandalia (Norbert J. Goetten, Stephen

E. Norris, and T. David Purcell, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE CHAPMAN delivered the opinion of the court:

The defendant, Allissa M. London, was convicted of unlawfully manufacturing methamphetamine (720 ILCS 570/401(a)(6.5)(B) (West 2000)). Prior to her trial, the defendant filed a motion to suppress evidence. Following an evidentiary hearing, the trial court denied the motion to suppress. The parties proceeded to a stipulated bench trial, at which the defendant was found guilty and sentenced to six years' imprisonment. On appeal, the defendant contends that the trial court improperly denied her motion to suppress evidence. We affirm.

## BACKGROUND

Allissa M. London (the defendant) was charged with unlawfully manufacturing methamphetamine. She filed a motion to suppress all the methamphetamine lab evidence gathered from a warrantless search and seizure at a farmhouse where she claimed to have been living. The trial judge conducted an evidentiary hearing on the motion. Codefendant Mark Hills joined in filing a motion to suppress, and the cases were consolidated for the purposes of the hearing only.

The defendant did not testify at the suppression hearing or at the stipulated bench trial. The court, however, did hear testimony at the suppression hearing from the following individuals: Fayette County Deputy Sheriffs Gary Washburn and Larry Halleman, Illinois State Police Trooper Timothy Mehl, St. Peter police officer Kevin Jenne, Virginia Ernst, Chuck Hayden, Jon Lotz, Barry Hodges (by stipulation that his testimony would be the same as Jon Lotz's), Mark Hills, and Larry White. A summary of relevant portions of their testimony follows.

Virginia Ernst owned some rural property with a farmhouse, located near Farina, Illinois. At one time she had lived on the property, but for the previous 20 years she had not. At the time of her testimony she lived in the town of Farina. Her grandson, Chuck Hayden, had lived in the farmhouse at one time, but that had been several years before. There had been several tenants over the years, and her grandson had assisted with some of the rentals. No one had lived in the farmhouse for some time.

On November 16, 2001, Ernst called Whitt's Plumbing to have someone winterize the farmhouse. Two employees from Whitt's Plumbing, Jon Lotz and Barry Hodges, went to the farmhouse about 3 p.m. that day. When they entered the farmhouse, they were surprised to find personal effects (*i.e.*, furniture, a large knife collection, and food in the refrigerator), since they had been told that the farmhouse

was empty. After performing a number of tasks on the first floor, they went upstairs to check if there was a bathroom. As they passed by a bedroom, they noticed someone lying on a bed. They could not tell whether the person was asleep or dead. At that point, they quickly left the farmhouse and reported to their boss what they had seen. Whitt called Ernst and told her what the employees had found at the farmhouse. In turn, Ernst called the sheriff's department and spoke to the dispatcher.

The dispatcher relayed the information to Deputy Larry Halleman. He told Deputy Halleman that someone from Whitt's Plumbing had gone out to winterize Ernst's vacant farmhouse and found personal effects, weapons, and a person either asleep or dead in one of the bedrooms. Ernst wanted them to run off whoever was in the farmhouse because it was supposed to be unoccupied. She called back a second time warning that they should send more than one officer because of the weapons. Deputy Halleman went to the farmhouse at approximately 6:30 p.m. He was accompanied by Deputy Gary Washburn, Officer Marxman, Trooper Timothy Mehl, and Officer Kevin Jenne.

As they drove up the lane, they observed a truck containing some furniture and household effects. They could see people moving around inside the farmhouse but no one outside. When they knocked at the front door, it was opened by a male identified as Larry White. White was asked who lived there, and he responded that he did not know. As the officers were talking with White, they saw a male in blue jeans without shoes or a shirt run from the rear of the farmhouse into some bushes. The man, identified as Mark Hills, was apprehended by the officers and taken to a squad car. When asked why he ran, he replied that there was an outstanding warrant for his arrest. Hills was also asked who lived in the farmhouse, and he, too, responded that he did not know. (Hills denies that he was asked this question.) Hills told the officers that there were others in the farmhouse. Three of the officers entered the farmhouse to make a protective sweep. They found a male identified as David Wade on the first floor. Two of the officers proceeded to the second floor, where the defendant was discovered in a bedroom. The defendant was asked if she lived there, and she replied that she did not, indicating that she was just sleeping there. The defendant was secured and placed in a different squad car than Hills. During the protective search of the farmhouse and a shed area, the officers observed numerous items commonly used in the manufacture of methamphetamine, as well as other drug paraphernalia. They also smelled anhydrous ammonia outside in the vicinity of the farmhouse and the shed.

After the initial sweep, Hills was again questioned. He then stated that he and the defendant were renting the farmhouse from Chuck Hayden and that the defendant had paid Hayden $100 towards the rental. The defendant was confronted with this new information and was asked if she had paid Hayden any money to rent the farmhouse. The defendant stated that she had not paid any money to rent the farmhouse and was not renting the farmhouse. One of the officers then called Ernst, advising her that they had found four individuals in the farmhouse and that they suspected that the place was being used to manufacture methamphetamine. Ernst was also asked if she knew someone named Chuck Hayden, to which she replied that, yes, he was her grandson. She gave Hayden's telephone number to the officer. The officer asked Ernst to come out to the farmhouse. The officer attempted to contact Hayden but was unsuccessful.

When Ernst arrived at the farmhouse, she was asked if anyone had authority to rent her property. According to all the officers, she was insistent that no one had authority to rent the property. According to Washburn and Mehl, she was also specifically asked if her grandson Hayden had permission to rent the property on her behalf, to which she responded "No."

However, when Ernst testified, she first stated that when the officers had asked her if anyone had authority to rent her farmhouse, she had told them that Chuck Hayden had that authority. But when pressed on cross-examination about this conversation, she was unsure if that is what she had said, stating that she did not remember clearly what the police had asked her and what she had said to them. She did, however, clearly remember signing the consent to search. She also stated that she had spoken to her grandson Hayden later that evening, *after* she got home from the farm.

At some point, a receipt for $100 (containing both the defendant's name and Chuck Hayden's name) was found in the farmhouse. There was conflicting testimony about whether the receipt had been found before Ernst was called to the farmhouse and signed the consent to search and whether Ernst had been shown the receipt.

Washburn testified that, before he asked Ernst to sign the consent-to-search form, he had contacted the Fayette County State's Attorney to seek advice regarding whether he could obtain a consent to search from Ernst or if he needed to obtain a search warrant. He informed the State's Attorney of the presence of drug paraphernalia, of Hills' conflicting statements regarding whether he and the defendant were renting the farmhouse, of the receipt for $100, of the defendant's denial that she paid a $100 deposit or lived there, and of Ernst's statements that she owned the property, that no one had authority to be

there or to lease it on her behalf, and that she wanted the people removed from the property.

Upon the State's Attorney's advice, the officers proceeded to ask Ernst for her consent to search the premises. After obtaining Ernst's written consent, the officers searched the farmhouse and recovered a large number of items used for the manufacture of methamphetamine. All four individuals found on the premises were arrested.

Chuck Hayden testified that he was living in Caseyville, Illinois, at the time of the incident. On the evening of November 15, the day before Ernst sent the police to the farmhouse, he had driven to his grandmother's farmhouse to pick up some car parts that he had stored there. It was dark when he arrived. When he pulled up to the farmhouse, Hayden testified, the defendant and Hills were there with possibly another person. Although he did not know they were going to be there, he was not surprised because the defendant had spoken with him sometime before about possibly renting the place. He could not remember whether the people were already in the farmhouse or outside when he arrived. He did not know how they got into the farmhouse. They had a truck with their possessions parked in the driveway. He agreed to rent the farmhouse to the defendant and Hills for $250 per month, and the defendant paid him $100 cash as a part of the security deposit. He wrote the defendant a receipt and proceeded to help the defendant and Hills move their belongings into the farmhouse. According to Hayden, until his grandmother called him on November 16, he had not yet gotten around to telling his grandmother that he had rented the farmhouse the day before to the defendant and Hills. Hayden claimed that his grandmother's call came immediately *before* she went out to the farm, at which time he advised her of the rental. At one point in his testimony, Hayden volunteered that he sometimes had problems with his memory.

At the conclusion of the evidentiary hearing, the trial court denied the motion to suppress. The trial court resolved all the factual disputes regarding the existence of a lease against the defendants. It noted the conflicting statements Hills and the defendant had made about whether they were renting the property. It found Hayden's testimony regarding the leasing of the property on November 15, 2001, improbable. The court found that there was no valid lease. The court also noted that Ernst's actions of calling the police and telling them to remove people from the property and consenting to the search even after being told of the receipt for rent indicated that Ernst did not consider Hills and the defendant "colorable" tenants. It further concluded that Hills' flight from the farmhouse suggested that he had no lease or other legal right to possess the property. Citing *Illinois v.*

*Rodriguez*, 497 U.S. 177, 111 L. Ed. 2d 148, 110 S. Ct. 2793 (1990), the court found that the officers had good reason to believe that Ernst had actual and/or apparent authority to consent to the search of the premises. It observed that the defendant's and Hills' denials of any interest in the property supported the officers' doubt of the legitimacy of any lease, despite the security deposit receipt bearing the defendant's name.

## ANALYSIS

A motion to suppress evidence generally presents mixed questions of law and fact. A reviewing court considers *de novo* the ultimate determination of the legal challenge to a denial of a motion to suppress, while according great deference to the factual findings of the trial court. We will not disturb a trial court's factual findings unless they are against the manifest weight of the evidence. *People v. Sorenson*, 196 Ill. 2d 425, 431, 752 N.E.2d 1078, 1083 (2001).

■ The fourth amendment states that the right of individuals "to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const., amend. IV. In order to challenge a search, a defendant must establish that he had a reasonable (or legitimate) expectation of privacy in the property searched or seized. *People v. McLaurin*, 331 Ill. App. 3d 498, 501, 772 N.E.2d 296, 299 (2002). The defendant bears the burden of demonstrating an illegal search or seizure. *People v. Kidd*, 175 Ill. 2d 1, 22, 675 N.E.2d 910, 921 (1996).

■ A warrantless search is presumptively invalid and *per se* unreasonable unless the search falls within a recognized exception. *United States v. Place*, 462 U.S. 696, 700-01, 77 L. Ed. 2d 110, 116-17, 103 S. Ct. 2637, 2641 (1983); *Coolidge v. New Hampshire*, 403 U.S. 443, 454-55, 29 L. Ed. 2d 564, 576, 91 S. Ct. 2022, 2032 (1971).

■ An "abandonment of property" is one recognized exception to the warrant requirement. This exception prevents individuals from effectively contesting the search or seizure of property after they have relinquished possession or ownership of the property. *People v. Smith*, 203 Ill. App. 3d 545, 551-52, 561 N.E.2d 252, 256 (1990). Abandonment has been viewed by the courts as a relinquishment of an interest in property to the extent that a defendant either (1) no longer has a reasonable expectation of privacy in the property or (2) no longer has standing to contest the subsequent search or seizure of the property. *Smith*, 203 Ill. App. 3d at 552, 561 N.E.2d at 256; see also *Smith*, 203

Ill. App. 3d at 552-53, 561 N.E.2d at 256-57 (discussing cases finding that an abandonment defeats a defendant's fourth amendment claim on both bases). Property that has been abandoned is no longer protected by the fourth amendment and may be searched or seized without a warrant. *People v. Slawek*, 98 Ill. App. 3d 1146, 1149, 425 N.E.2d 26, 28-29 (1981).

Abandonment is primarily a question of intent, inferred from words, objective facts, and other conduct. *United States v. Jackson*, 544 F.2d 407, 409 (9th Cir. 1976). Where, as in this case, the defendant chooses not to testify, the defendant's subjective intent becomes very difficult to discern. In an analogous factual situation, the Seventh Circuit Court of Appeals found that " 'without an affidavit or testimony from the defendant it is almost impossible to find a privacy interest because this interest depends, in part, on the defendant's subjective intent and his actions that manifest that intent.' " *United States v. Ruth*, 65 F.3d 599, 605 (7th Cir. 1995).

The defendant asserted at her suppression hearing that she had a reasonable expectation of privacy in the premises. We believe, however, that her actions at the time of the search and seizure belie that intent. Most notably, the defendant's actions—statements that she was not living at the farmhouse and had not rented it—manifested a direct disavowment of any privacy interest. The denial of any interest (in the thing or place abandoned) is an important factor in analyzing the issue of abandonment. *United States v. Nordling*, 804 F.2d 1466, 1469 (9th Cir. 1986). The denial of ownership is an objective demonstration of an intent to abandon property. *Nordling*, 804 F.2d at 1470.

Here, the words and actions of the other three individuals did little more to establish the defendant's expectation of privacy: Hills actually fled, partially clothed, into the bushes, when the officers approached the farmhouse; White told the officers that he did not know who lived there, as did Wade and Hills (initially). The only factor indicating a privacy interest is Hills' later claim that he and the defendant were renting the farmhouse, which was supported by the discovery of a "receipt" for $100 containing the defendant's name. However, *after* Hills' contradictory statement and the discovery of the receipt, the defendant *again* denied renting or living at the farmhouse. Because fourth amendment rights are personal and may not be raised vicariously (*Rakas v. Illinois*, 439 U.S. 128, 133-34, 58 L. Ed. 2d 387, 394, 99 S. Ct. 421, 425 (1978)), Hills' assertions (which might give rise to his own expectation-of-privacy interest) do not bolster the defendant's claim of an expectation of privacy, since she continued to deny any interest.

Nor did Hayden's testimony—that he had leased the premises to

the defendant and Hills—add any credibility to a claim of a reasonable expectation of privacy. The trial court found his testimony "improbable." We agree, believing that Hayden's rendition of the facts bordered on the absurd. We also note that Hayden volunteered in his testimony that he sometimes had memory problems.

Furthermore, whether there was in fact a valid lease does not resolve the issue of a privacy interest. The concepts of state property law, while relevant, are not dispositive in determining a reasonable privacy interest for fourth amendment purposes. *Smith*, 203 Ill. App. 3d at 553-54, 561 N.E.2d at 257 (relying extensively on *United States v. Wilson*, 472 F.2d 901 (9th Cir. 1972)). Even with a valid lease, the defendant, by her conduct, still could have effectively abandoned her interest, which would have then reverted to Ernst. See *United States v. Levasseur*, 816 F.2d 37, 44 (2d Cir. 1987). Because we find that the defendant's actions amounted to an abandonment, it is not necessary to make a determination whether there was in fact a valid lease interest.

A determination must be made in light of the totality of the circumstances. *Nordling*, 804 F.2d at 1469. While the "receipt for rent" is a factor to be considered, it is but one factor in the totality of the circumstances before the court. See *Smith*, 203 Ill. App. 3d at 555, 561 N.E.2d at 258. The totality of the circumstances here leads us to the determination that the defendant abandoned any reasonable expectation of privacy she might have had in the premises. Absent the defendant's expectation of privacy, a warrantless search was valid based on the voluntary consent of Ernst, a consensual search being another recognized exception to the warrant requirement. See *People v. Robinson*, 322 Ill. App. 3d 169, 176, 748 N.E.2d 739, 745 (2001).

■ Furthermore, even if the defendant had a reasonable expectation of privacy that she had not abandoned, based on *Rodriguez* we would still find the warrantless search valid. In *Rodriguez*, the United States Supreme Court held that a warrantless search is valid when the police reasonably believe under the circumstances that the person giving consent has that authority, even if it is later determined to be erroneous. *Rodriguez*, 497 U.S. at 188-89, 111 L. Ed. 2d at 161, 110 S. Ct. at 2801. This criterion satisfies the "reasonableness" requirement of the fourth amendment and comports with the purpose of the exclusionary rule, *i.e.*, to deter unlawful police conduct in a search and seizure. See *United States v. Sledge*, 650 F.2d 1075, 1081 n.11 (9th Cir. 1981) (relying on *United States v. Peltier*, 422 U.S. 531, 542, 45 L. Ed. 2d 374, 384, 95 S. Ct. 2313, 2320 (1975)). *Rodriguez* instructs that the police need not always be correct but that they must always be reasonable in their factual determinations surrounding search-and-seizure

issues. *Rodriguez*, 497 U.S. at 185, 111 L. Ed. 2d at 159, 110 S. Ct. at 2800. Viewing the apparent facts available to the officers at the time of the search and seizure, we find that it was reasonable for them to believe that no one other than Ernst had the authority to consent to a search of the premises.

We find additional support in *Smith*. There, the appellate court applied the "reasonable but erroneous" standard set forth in *Rodriguez* to determine whether factual circumstances warranted the police's belief that a defendant had abandoned the premises. *Smith*, 203 Ill. App. 3d at 557, 561 N.E.2d at 259. The court found that this standard satisfied the "reasonableness" requirement of the fourth amendment in situations where police formed a reasonable but mistaken belief that premises had been abandoned. *Smith*, 203 Ill. App. 3d at 559, 561 N.E.2d at 260.

We agree with the holding in *Smith*. To hold otherwise would place police in the untenable position of being judged on their actions in situations where from all outward appearances property has been abandoned but a defendant later claims to have retained a subjective interest.

Based on the foregoing, we find that the court made well-reasoned factual determinations and credibility assessments. The totality of the circumstances before the court showed that (1) the defendant abandoned any reasonable expectation of privacy she had in the premises or (2) the officers had a reasonable but erroneous belief that Ernst had authority to consent to a search of the premises or (3) the officers had a reasonable but erroneous belief that the defendant's conduct amounted to an abandonment. Any one of these scenarios allowed for Ernst to authorize a consensual search of the premises without a warrant. Consequently, we find that the trial court did not abuse its discretion in denying the motion to suppress evidence seized from the premises. We therefore affirm its ruling denying the defendant's motion to suppress, and we affirm the defendant's conviction.

Affirmed.

PRESIDING JUSTICE DONOVAN, specially concurring:

Relying upon the reasoning of the Supreme Court in *Rodriguez*, I concur in the denial of defendant's motion to suppress. Given the facts available to the officers at the time of the search, it was reasonable for them to believe that Ernst had the authority to consent to a search of

the premises. I agree with Justice Kuehn's dissent to the extent that the defendant did not abandon her privacy interest in the farmhouse.

JUSTICE KUEHN, dissenting:
The use of abandonment, or a reasonable, but erroneous, belief in abandonment, to justify this search is misplaced. The defendant did not abandon her privacy interests in the farmhouse by lying to police officers when confronted about whether she was living amidst a newly erected methamphetamine lab. This was a consensual search of a lessee's home, based upon an invalid consent obtained from the property owner.

None of the circumstances warranted a belief, reasonable or otherwise, that the premises constituted abandoned property. People were moving into the farmhouse, not moving out of it. The refrigerator was freshly stocked, and in use. The utilities were turned on. The farmhouse was furnished. And, quite obviously, the house's occupants had set up a methamphetamine lab. Presumably, they intended to use it at some imminent future time.

It would have been decidedly improper for officers to treat the farmhouse as abandoned property and search it for that reason. Neither Mark Hills' flight nor the defendant's denials about residency allowed for it. *Someone* clearly lived in the farmhouse, even if Hills and the defendant did not. *Someone* clearly had constitutionally protected privacy interests in the farmhouse and its contents. The officers recognized as much.

I turn to my colleagues' validation of the consensual search. They deem the request for a consent to search reasonable. This is why. Virginia Ernst (Virginia) originated the officers' presence with a request for them to remove strangers from her property. According to those officers, Virginia disavowed her grandson's authority to lease the premises. Mark Hills (Hills) ran from the house and initially denied living there. Then, the defendant twice denied living there, contradicting Hills' belated admission about a recently entered-into lease. *Ergo*, the officers could reasonably believe that Virginia had the authority to consent to a search of someone else's recently acquired home.

Chuck Hayden (Hayden) rented the farmhouse to Hills and to the defendant. This is beyond question. Hayden testified that he rented the house to them and that the defendant paid him a $100 rental deposit. Virginia testified that Hayden had more than apparent authority to rent the house. According to Virginia, he had actual authority. And both Hills and the defendant confirm, in their motions to suppress, that they rented the farmhouse from Hayden. There is even a written receipt that memorializes the rental transaction and cor-

roborates everyone's position. Moreover, there is absolutely nothing to contradict the tenancy's existence.

We should begin by clearly acknowledging that the defendant possessed a reasonable expectation of privacy in her newly acquired home and that she was entitled to the fourth amendment's promise of protection against unreasonable searches. The only question presented is whether circumstances warranted a reasonable belief that Virginia had the authority to allow a search, when officers asked her for permission to search the farmhouse.

Here is why the Constitution permits certain erroneous consensual searches to stand.

> " 'Because many situations which confront officers in the course of executing their duties are more or less ambiguous, room must be allowed for some mistakes on their part. *But the mistakes must be those of reasonable men, acting on facts leading sensibly to their conclusions of probability.*' " (Emphasis added.) *Illinois v. Rodriguez,* 497 U.S. 177, 186, 111 L. Ed. 2d 148, 159-60, 110 S. Ct. 2793, 2800 (1990), quoting *Brinegar v. United States,* 338 U.S. 160, 176, 93 L. Ed. 1879, 1891, 69 S. Ct. 1302, 1311 (1949).

> "[I]n order to satisfy the 'reasonableness' requirement of the Fourth Amendment, what is generally demanded of the many factual determinations that must regularly be made by agents of the government *** is not that they always be correct, but that they always be reasonable." *Rodriguez,* 497 U.S. at 185-86, 111 L. Ed. 2d at 159, 110 S. Ct. at 2800.

Did the officers in this case mistake Virginia's authority to consent, while acting on facts that led sensibly to a conclusion that her consent could authorize a constitutional search of the farmhouse? In light of Hills' belated claim of tenancy, the person with whom he claimed to have dealt, the circumstances that existed at the farmhouse, a friend who confirmed the rental transaction, and a written receipt that memorialized details of Hills' claim, officers confronted a real possibility that Hills and the defendant were tenants with protected privacy interests in the premises. The officers confronted an uncertainty that could not lead them to sensibly conclude that Virginia, as opposed to Hills, could authorize a constitutional search by giving her permission. Simply put, the officers confronted an ambiguous situation that they chose to resolve with a guess that proved wrong.

The obvious factual ambiguities that led to a consultation with a State's Attorney also led sensibly to an entirely different course of action that *reasonable* law enforcement officers would have taken. With the potential that a leasehold estate existed, reasonable law enforce-

ment officials would have pursued a less convenient, more labor-intensive course of action that would have ensured constitutional compliance. On the distinct possibility that Hayden, acting with apparent authority from his grandmother, and unbeknownst to her, rented the farmhouse to Hills and the defendant, reasonable officers of the law would have simply pursed the constitutionally favored authorization for the search of an American's home. They would have procured a search warrant. Observations made during the protective sweep clearly provided probable cause to obtain one.

Taking a handy, constitutionally uncertain path to search someone's home, instead of using a search warrant, is not official decisionmaking that I would term "reasonable." The erroneous reliance upon an invalid consent to search this farmhouse, given the conflicting circumstances and the obvious opportunity to procure a search warrant, does not constitute the kind of mistake that we should be willing to tolerate. Law enforcement should not be excused from making it. The fourth amendment promise deserves a little more reasonableness.

What facts did the officers confront when they decided to forego a search warrant and ask for Virginia's permission to search someone else's residence? First of all, they had Hills' statement that he, and the defendant, rented the farmhouse the day before from a man named Chuck Hayden and that the defendant paid Hayden $100 for a part of the first month's rent. Hills detailed how he came into possession of the premises with knowledge of the protective sweep and its revelations. This was far more than an idle assertion. This was an admission, made with full knowledge that it spelled adverse consequence. Next, the officers had confirmation of the lease from Hills' friend, Larry White (White). The officers had no reason to consider this a White lie.

Hills' admission was also corroborated by the circumstances. It was consistent with Hills' and the defendant's obvious access to the farmhouse. It was consistent with the freshly stocked refrigerator. A very recent rental agreement was consistent with a truck full of furniture. And one circumstance uniquely credited Hills' admission. The protective sweep allowed officers to know that Hills felt secure enough in his right to exclusively possess the farmhouse to erect a methamphetamine lab inside it.

When the officers asked Virginia if she knew anyone named Chuck Hayden, Virginia told them that he was none other than her grandson. It would have seemed sensible to conclude at that point that Hills was being truthful about a lease transaction. Regardless of Virginia's position about Hayden's authority to lease, the officers could not ignore a

real possibility that her grandson, clothed with the apparent authority to do so, took rent from the defendant.

Virginia's testimony conflicted with the testimony of two officers, evidence that sharply diverged over whether Virginia reported her grandson's past rentals of the farmhouse and his authority to rent it anew. My view of this search does not depend upon who testified truthfully. However, since it is undisputed that Hayden indeed had rented out the farmhouse in the past, and since history included this simple truth about Hayden and farmhouse rental, Virginia had no reason to lie about it to police officers. The majority's view implicitly concludes that Virginia, contrary to her sworn testimony, lied to police officers about her grandson's authority to rent the farmhouse.

Next, the officers could see that the farmhouse was not run down or in a state of disrepair. The house and its grounds were maintained. The house did not have a dilapidated, unattended appearance. No one would think that it could be used without permission to run an undetected illegal drug laboratory. Hills' physical possession of a farmhouse in this farmhouse's condition could not lead sensibly to a conclusion that Hills was a complete interloper. The idea that Hills simply moved into the farmhouse and erected his lab there was not only belied by the condition of the house itself but by Hills' admission about the lease, White's corroboration of it, Hills' claim that he dealt with Virginia's grandson, and the surrounding circumstances consistent with a leasehold. Notwithstanding, the officers had to conclude that Hills was an interloper in order to conclude that Virginia could legally permit a search.

My colleagues credit the defendant's denials about the leasehold and residency in weighing how reasonably the officers acted. In fact, the officers always treated the denials for what they were—lies in an attempt to avoid being charged because of the methamphetamine lab. The defendant was not released from custody when she denied living there or paying any rent to Hayden. She was always treated like she was in possession of the farmhouse and its illegal drug lab. To the extent that the defendant's custodial denials raised doubts about Hills' admission of a leasehold, those doubts should have been quieted when the officers discovered a receipt that bore witness to Hills' earlier claims about the details of the rental transaction.

The officers found a document that acknowledged Hayden's receipt of $100 from the defendant. Hills had earlier admitted that he rented the farmhouse from Hayden, the property owner's grandson, and that the defendant had paid partial rent in the amount of $100. This was told to the officers before they discovered the written receipt that evidenced the details of the admitted rental transaction. Thus, Hills

was further corroborated by documentary proof, before the officers decided to forego a search warrant and ask for Virginia's consent to search.

With the existence of these circumstances, the officers simply could not reasonably foreclose a possibility that Hills and the defendant possessed legitimate expectations of privacy in the farmhouse. Even if Virginia had defied history and lied about Hayden's actual authority to rent the farmhouse, that misinformation did not end the need for further inquiry. Indeed, the officers tried to contact Hayden, presumably to ask whether he rented the farmhouse without Virginia's permission. Even if Virginia had lied to officers about Hayden's authority to rent the farmhouse, there remained a reasonable possibility that Hills and the defendant had engaged in the claimed transaction with Hayden. They could obtain legitimate expectations of privacy in the premises if Hayden held himself out as an agent and Hills reasonably believed that Hayden had the authority to rent the farmhouse.

In light of Hills' admission about the tenancy, White's corroboration of it, the circumstances at the farmhouse consistent with it, the physical condition of the house itself, and the written receipt that evidenced not only the leasehold's general existence but details about the claimed rental transaction—in light of the totality of the circumstances, asking for Virginia's permission to search resulted in a mistake that reasonable men would not have made. The facts did not lead sensibly to their conclusion of probability that Virginia could validly consent. Reasonable law enforcement officers would have obtained a search warrant.

For the foregoing reasons, I respectfully dissent.