In the

# United States Court of Appeals
## For the Seventh Circuit

No. 15-3187

TOLL PROCESSING SERVICES, LLC,

*Plaintiff-Appellant,*

*v.*

KASTALON, INC., and KASTALON
POLYURETHANE PRODUCTS,

*Defendants-Appellees.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 12-cv-10058 — **Sharon Johnson Coleman**, *Judge.*

ARGUED MARCH 31, 2016 — DECIDED JANUARY 23, 2018

Before MANION and KANNE, *Circuit Judges*, and PEPPER,
*District Judge.*[*]

PEPPER, *District Judge.* Toll Processing Services, LLC ("Toll
Processing") appeals from the district court's order granting
summary judgment in favor of Kastalon, Inc. and Kastalon

---

[*] The Honorable Pamela Pepper, United States District Court for the
Eastern District of Wisconsin, sitting by designation.

Polyurethane Products (collectively, "Kastalon") on Toll
Processing's conversion and negligence claims. We reverse
the district court's order as to those claims, and remand the
case for further proceedings.

## I. Background

This is a diversity case, governed by Illinois law, involv-
ing state law contract and tort claims. Appellant Toll Pro-
cessing is a subsidiary of International Steel Services, Inc.; it
was formed in 2006 for the purpose of owning and operating
a pickle line.[1] Appellee Kastalon provides equipment and
repairs for the steel industry. In 2006, Toll Processing pur-
chased a used pickle line from Joseph T. Ryerson & Sons,
Inc.; the line included fifty-seven pickle line rolls, some of
which were in need of repair. Kastalon had serviced the rolls
during the time Ryerson owned the line.

Toll Processing planned to reinstall the Ryerson pickle
line somewhere else, but as of the spring of 2007, did not
have a facility in which to put it, or anywhere to store the
rolls. In April 2007, Toll Processing began to disassemble the
used pickle line at Ryerson's facility in Chicago. Early in
2008, Kastalon agreed that it would move the rolls to its
facility and store them, at no cost, until Toll Processing could
issue a purchase order to Kastalon to recondition the rolls. In
January of that year, Paula Dent—a former Ryerson employ-

---

[1] A pickle line is a machine used in the steel industry to process hot
rolled steel coil through acid tanks (to remove rust and impurities)
before the steel coil is rinsed, dried, sheared, trimmed and recoiled at the
end of the line. The steel moves through the line on a series of pickle
rolls. Pickle rolls belonging to the appellant—first their storage, then
their loss—are the subject of this appeal.

ee, and a plant and project manager for Toll Processing—orally contacted Kastalon's vice president and half owner Michael DeMent to make the arrangements. Dent was Kastalon's main contact regarding the pickle line.

Both parties initially believed that Toll Processing would complete its plan to re-install the pickle line within months, but they did not discuss a specific timeframe during which Kastalon would store the rolls. Kastalon appears to have assumed that it would be storing the rolls for a few months only; both parties expected Toll Processing to find a new facility shortly. Regardless of timing, the parties agree that Kastalon was storing the rolls while it waited for Toll Processing to issue it a purchase order for the repair and reconditioning of those rolls that needed it.

Malvin Sander, vice president and general counsel for Toll Processing, represented Toll Processing in negotiating its purchase of the pickle line. Later, at his deposition, Sander testified that he agreed it would not have been reasonable for Toll Processing to expect Kastalon to store the rolls forever. Gus Schempp, a consultant hired to assist in disassembling the line and reinstalling it at its new location, testified at his deposition that he did not know what Kastalon's storage obligation would be if Toll Processing never issued the expected reconditioning purchase order.

Kastalon moved fifty-seven pickle rolls to its facility in Alsip, Illinois, over the first three months of 2008. After March 2008, however, Dent had no further contact with Kastalon about the rolls. In fact, Toll Processing laid Dent off in April 2008, but did not inform Kastalon that Dent had been let go. In October 2008, DeMent called Gus Schempp at Toll Processing regarding the disassembling/reinstallation

project. Schempp did not tell DeMent that the project to reinstall the line had been delayed (although it appears that it had been). DeMent also sent Schempp an email asking to be kept informed as to the progress of the reinstallation project; Schempp did not respond.

Over the next two years, Toll Processing negotiated with various companies, either to set up and run the pickle line, or to sell it. It was not in communication with Kastalon about the line during that period. Kastalon stored the rolls indoors for about two years. At some point, though, Kastalon used a crane to move the rolls from their original location inside the facility to another location inside the facility, which took four to five hours of labor. Later, Kastalon greased and wrapped the rolls before moving them to be stored outside under tarps, which took about ten hours of labor. Kastalon's plant manager testified at his deposition that the condition of the rolls did not change while they were in Kastalon's possession.

In November or December 2010—some two years after the last contact between the two companies—DeMent contacted Dent and Carlos Monzon (a former Ryerson employee, who was hired by Toll Processing and later laid off). Dent and Monzon informed DeMent that they were unemployed. DeMent did not specifically enquire into the status of the rolls, or inform Dent or Monzon that Kastalon planned to dispose of the rolls. He testified at his deposition that after this conversation, he thought that Toll Processing had gone out of business. He also indicated that he believed that the pickle rolls were in poor condition and had little value.

Subsequent to the conversation between DeMent, Dent and Monzon, Kastalon concluded that the rolls had been abandoned, had them scrapped by a local recyler and received $6,380.80. Before scrapping the rolls, Kastalon did not inspect them to determine their condition.

In June 2011, Toll Processing believed that it was close to finalizing arrangements to reinstall the pickle line, which would call for repair and refurbishment of the rolls. Schempp called DeMent to request a price quote for reconditioning the rolls so they could be put into service. DeMent informed Schempp that the rolls had been scrapped. Toll Processing obtained quotes for replacement rolls, the lowest of which was $311,750, plus $104,905 for roll covers (apparently a quote from Kastalon), for a total replacement cost of $416,695. Toll Processing never issued a purchase order to Kastalon to refurbish the rolls.

Toll Processing filed a three-count complaint pleading claims for conversion, negligence and breach of contract. The parties each moved for summary judgment. The district court granted summary judgment in favor of Kastalon and against Toll Processing as to each of Toll Processing's claims.

## II. Analysis

We review the district court's grant of summary judgment *de novo*. *Boss v. Castro*, 816 F.3d 910, 916 (7th Cir. 2016). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also*, *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). The parties agree that Illinois substantive law applies to the state law claims.

**A. Conversion**

The district court granted summary judgment to Kastalon on Toll Processing's conversion claim, finding that the defense of abandonment precluded the claim.

To state a claim for conversion under Illinois law, a plaintiff must allege: "(1) an unauthorized and wrongful assumption of control, dominion, or ownership by defendant over plaintiff's personalty; (2) plaintiff's right in the property; (3) plaintiff's right to the immediate possession of the property, absolutely and unconditionally; and (4) a demand for possession of the property." *Gen. Motors Corp. v. Douglass*, 565 N.E.2d 93, 96–97 (Ill. App. Ct. 1990). The parties do not appear to dispute that Toll Processing proved the elements of conversion under Illinois law. Rather, the parties dispute whether Kastalon has a viable affirmative defense to the conversion.

Abandonment of property is a defense to conversion. "[P]roperty is considered to be abandoned when the owner, intending to relinquish all rights to the property, leaves it free to be appropriated by any other person." *Bell Leasing Brokerage, LLC v. Roger Auto Serv., Inc.*, 865 N.E.2d 558, 564 (Ill. App. Ct. 2007). Whether a party has abandoned property is a question of fact, unless the party's conduct is so decisive and unambiguous that the question can be decided on summary judgment as a matter of law. *E.g., People v. London*, 831 N.E.2d 1135, 1140–41 (Ill. App. Ct. 2005) ("Abandonment is primarily a question of intent, inferred from words, objective facts, and other conduct."); *People ex rel. NBD Tr. Co. of Ill. v. Village of Hoffman Estates*, 600 N.E.2d 58, 61-62 (Ill. App. Ct. 1992) ("A party may be found to have abandoned a contract when the circumstances or his conduct clearly

evidences an abandonment and the acts relied upon must be positive, unequivocal, and inconsistent with the existence of the contract.").

Toll Processing argues that the district court "made an error of law in determining that Toll Processing abandoned the" rolls, because "Kastalon did not put forth any record evidence of an intent to abandon by Toll Processing." Appellant's Br. at 20, ECF No. 18. According to Toll Processing, Kastalon's only evidence of abandonment "was the mere fact that the parties did not communicate about the [r]olls between October 2008 and December 2010." *Id.* Toll Processing asserts that the following undisputed facts "negate an intent to abandon:" Toll Processing was "engaged in ongoing negotiations for a joint venture to operate the pickle line and that those negotiations were active as late as September 2013," and Schempp called DeMent "in June 2011 because Toll Processing was very close to finalizing an agreement to re-install the pickle line, and Mr. Schempp wanted to get a quote for reconditioning the [r]olls." *Id.* at 20–21.

Intent to abandon property rights is a question of fact, and we conclude that the evidence was not sufficient to allow the district court to decide on summary judgment that Toll Processing intended to abandon the rolls. The fact that approximately thirty months passed before Toll Processing initiated contact with Kastalon about the rolls did not constitute abandonment as a matter of law. The district court concluded to the contrary, relying on three cases involving oil and gas leases, in which Illinois courts found that a prolonged cessation of drilling operations could amount to

abandonment of a lease.[2] While those cases involved periods similar to the thirty-month period here, each was decided after a trial on the merits, not on summary judgment.

Moreover, the rationale underlying those decisions is inapplicable here. The Illinois courts reasoned that the purpose of an oil or gas lease is to obtain production from the land; a lessor cannot receive the royalties (the consideration) contemplated under the lease unless the lessee takes consistent affirmative actions to produce oil or gas. *Pieszchalski v. Oslager*, 470 N.E.2d 1083, 1089–90 (Ill. App. Ct. 1984). In light of the commercial purpose of the lease, the courts held that a prolonged cessation of drilling operations could establish that the lessee has abandoned the lease, and courts will declare leases terminated in order to promote development of the land. *Id.* at 1090 (citing *Belden v. Tri-Star Producing Co., Inc.*, 435 N.E.2d 927, 933 (Ill. App. Ct. 1982)). The agreement between Toll Processing and Kastalon did not provide for payments to Kastalon out of funds received from some activity conducted by Toll Processing. The agreement was only that Kastalon would store the rolls until it received a purchase order from Toll Processing to repair or refurbish them. Comparing oil and gas leases to the agreement between these two parties is inapposite.

The answer to the question of whether Toll Processing abandoned the rolls depends on whether Toll Processing's delay in contacting Kastalon constituted decisive and unambiguous evidence that Toll Processing intended to relinquish

---

[2] *Spies v. DeMayo*, 72 N.E.2d 316 (Ill. 1947); *Shannon v. Stookey*, 375 N.E.2d 881 (Ill. App. Ct. 1978); *Pieszchalski v. Oslager*, 470 N.E.2d 1083 (Ill. App. Ct. 1984).

its rights to them. It is conceivable that a reasonable jury could determine that the duration of Toll Processing's prolonged silence evidenced its intent to abandon the rolls. A reasonable jury also could conclude, however, that Toll Processing's prolonged silence, standing alone, did not constitute that decisive and unambiguous evidence of intent to abandon.

There is no evidence in the record that Toll Processing acted inconsistently with the parties' oral agreement that Kastalon would store the rolls until Toll Processing submitted a purchase order for their reconditioning. The record contains no evidence that anyone from Toll Processing told anyone from Kastalon that Toll Processing no longer wanted the rolls, or did not plan to use them or sell them. A jury could conclude that the work Kastalon voluntarily undertook to wrap and move the rolls—which required Kastalon to commit its manpower, if not financial resources—was evidence that Kastalon did not think that Toll Processing had abandoned the rolls at the time Kastalon performed that work. These are issues of fact for a jury to decide at trial, not for the court to decide on summary judgment. We conclude that there was a genuine dispute of material fact as to whether Toll Processing abandoned the rolls, such that it could not prove a conversion claim.

The district court stated that, even had it not determined that Toll Processing abandoned the rolls, the economic loss doctrine, known as the *Moorman* doctrine[3] in the Illinois courts, barred Toll Processing's conversion claim. The district court acknowledged that there was little law apply-

---

[3] *See Moorman Mfg. Co. v. Nat'l Tank Co.*, 435 N.E.2d 443 (Ill. 1982).

ing the *Moorman* doctrine to conversion claims. It cited to one federal district court case, *Lansing v. Carroll*, No. 11 C 4153, 2012 WL 4759241 (N.D. Ill. Oct. 5, 2012), in which the court had applied the economic loss doctrine to bar an ersatz conversion claim on summary judgment. The district court relied on the *Lansing* decision to conclude that the *Moorman* doctrine barred Toll Processing's conversion claim in this case.

Toll Processing asserts that the district court erred in applying the *Moorman* doctrine. It argues that the district court did not cite to any cases in which an Illinois court had applied the *Moorman* doctrine to bar a conversion claim. Appellant's Br. at 22. It argues that the district court did not analyze *Moorman*, or "address whether Toll Processing's damages constitute purely 'economic losses' as defined by the *Moorman* case." *Id.* at 25. Toll Processing also argued that Kastalon's duty not to convert the rolls arose from something other than the oral contract between the parties. *Id.* at 25-26. In its reply brief, Toll Processing asserted that the non-contractual duty not to convert was a common law duty. Appellant's Reply Br. at 7-10, ECF No. 26.

Toll Processing is correct that the district court did not cite any Illinois case that had applied the *Moorman* doctrine to bar a conversion claim. The federal case the district court cited, *Lansing*, is not clearly dispositive. The district court in *Lansing* determined that the defendants' counterclaim for "conversion" really was a quasi-contract claim. The plaintiffs had argued that they were entitled to buy and close on the defendants' property interest under provisions of shareholder and operating agreements. *Lansing*, 2012 WL 4759241 at *3. The defendants counterclaimed, arguing that the

plaintiffs' interpretation of those provisions was insupportable. *Id.* The *Lansing* court concluded that the defendants' counterclaim for conversion was not really a tort claim; it was an iteration of the parties' dispute over the contract. The court was not able to identify any non-contractual duty by the plaintiffs not to convert. *Id.* Because the defendants were seeking purely economic damages for harm based on "a contract-like interest," the *Lansing* court applied the *Moorman* doctrine and barred the defendants' conversion counterclaim. *Id.*

As Toll Processing argues, the district court here did not consider whether Kastalon had an extra-contractual duty not to dispose of the rolls. The *Moorman* doctrine "limits the claims of parties who allege breach of a contract to contractual remedies, rather than tort remedies. Put another way, if a plaintiff claims that a defendant breached an obligation other than a contractual obligation, the *Moorman* doctrine does not apply." *Trade Solutions Inc. v. Eurovictory Sports, Inc.*, No. 97 CV 1153, 1998 WL 111639 at *4 (N.D. Ill. March 9, 1998). If Kastalon had a common-law duty not to dispose of the rolls that arose from a source other than the contract, the *Moorman* doctrine would not bar Toll Processing's conversion claim.

Further, there are exceptions to the *Moorman* doctrine. *See, e.g.*, *Fireman's Fund Ins. Co. v. SEC Donohue, Inc.*, 679 N.E.2d 1197, 1199-1200 (Ill. 1997). On appeal, Toll Processing argued that it was seeking damages "for property loss resulting from a sudden occurrence, namely, the unilateral and unauthorized disposal of the [r]olls." Appellant's Brief at 25-26. One of the exceptions to the *Moorman* doctrine occurs "where the plaintiff sustained personal injury or

property damage resulting from a tortious event, *i.e.*, a sudden or dangerous occurrence … ." *Fireman's Fund Ins. Co.*, 679 N.E.2d at 1199. The district court did not discuss whether any exception to the *Moorman* doctrine applied here.

We will reverse the district court's grant of summary judgment in favor of Kastalon based on the affirmative defense of abandonment; there are genuine issues of material fact on that defense, such that neither party is entitled to summary judgment on that basis. We remand to the district court for further proceedings on the conversion claim.

**B. Negligence**

The district court granted summary judgment to Kastalon on Toll Processing's negligence claim, finding that Kastalon had met its duty to act reasonably with regard to the rolls.

In its motion for summary judgment, Toll Processing argued that it was entitled to a presumption that Kastalon was negligent in caring for the rolls, because Toll Processing had proven a *prima facie* case of bailment. R. 85 at 7-8. Under Illinois law, a "bailment is the delivery of property for some purpose upon a contract, express or implied, that after the purpose has been fulfilled, the property shall be redelivered to the bailor, or otherwise dealt with according to his directions, or kept until he reclaims it." *Wausau Ins. Co. v. All Chicagoland Moving & Storage Co.*, 777 N.E.2d 1062, 1067 (Ill. App. Ct. 2002) (quoting *Am. Ambassador Cas. Co. v. Jackson*, 692 N.E.2d 717 (Ill. App. Ct. 1998)). "To recover under a bailment theory, a plaintiff must establish (1) an express or implied agreement to create a bailment; (2) a delivery of the

property in good condition; (3) the bailee's acceptance of the property; and (4) the bailee's failure to return the property or the bailee's redelivery of the property in a damaged condition." *Id.* at 1068.

"Establishing a *prima facie* case of bailment raises a presumption of negligence by the defendant … ." *Magee v. Walbro, Inc.*, 525 N.E.2d 975, 977 (Ill. App. Ct. 1988). To rebut the presumption that the defendant acted negligently, the defendant must present evidence "sufficient to support a finding of the nonexistence of the presumed fact." *Id.*, quoting *Wright v. Autohaus Fortense, Inc.*, 472 N.E.2d 593, 596 (Ill. App. Ct. 1984).

In responding to the motion for summary judgment, Kastalon argued that Toll Processing never had properly asserted a separate cause of action for bailment, and that it had "filed an amended pleading that specifically excluded bailment." R. 93 at 8. Kastalon further argued that, even had Toll Processing specifically pled bailment, Toll Processing could not establish a *prima facie* case of bailment because there was no express contract between the parties, the parties contemplated only short-term storage of the rolls, some of the rolls were in bad shape when Kastalon received them and Toll Processing had abandoned the rolls. *Id.* at p. 10.

The district court did not address these arguments. Rather, after recounting Illinois law on bailment, the district court stated that, "[f]rom the undisputed facts there seems to be an implied bailment, the rolls were delivered, and not returned." *Toll Processing Services, LLC v. Kastalon, Inc. and Kastalon Polyurethane Products*, 2015 WL 5179685, at *5 (N.D. Ill. Sept. 4, 2015). Apparently concluding that Toll Processing

was entitled to a rebuttable presumption of negligence, the court turned to the proposition that Illinois law requires a bailee to "exercise reasonable care under the circumstances." *Wausau Ins. Co.*, 777 N.E.2d at 1068 (citing *Ortiz v. Warren Chevrolet, Inc.*, 321 N.E.2d 77, 79 (Ill. App. Ct. 1974). Citing *Wausau Ins. Co.*, the court stated, "[w]hether a bailee exercised reasonable care under the circumstances is ordinarily a question of fact, but may be decided as a matter of law on summary judgment if the undisputed facts conclusively demonstrate that the bailee has exercised its duty." *Toll Processing Services, LLC*, 2015 WL 5179685, at *5. The district court concluded that because the parties had not agreed on how long Kastalon was obligated to store the rolls, "it was reasonable for Kastalon, which is not a storage facility, to conclude that Toll Processing had abandoned the rolls after thirty-two months with no contact." *Id.* Having decided that Kastalon had met its duty of care, the court found against Toll Processing and in favor of Kastalon on the negligence claim.

The district court paraphrased *Ortiz's* discussion of when it is appropriate for a trial court to decide the factual question of reasonable care on summary judgment. The *Ortiz* court said,

> The defendant is correct in pointing out that the presumption of negligence which arises on proof of delivery of property to a bailee in good condition and its redelivery in damaged condition merely shifts the burden of going forward with the evidence, and disappears upon the production of any evidence of the bailee's having exercised due care. The defendant

correctly observes, further, that a bailee for hire is not an insurer of the bailed property, although obligated to exercise reasonable care under the circumstances. However, whether a bailee has met the burden of showing that damage to the bailed property occurred without the bailee's fault is ordinarily a question of fact for the trier of fact.

*Ortiz*, 321 N.E.2d at 79-80 (citations omitted).

The district court appears to have concluded that Toll Processing put forth a *prima facie* case of bailment, and that as a result, the burden of proof on negligence shifted from Toll Processing to Kastalon. The court did not, however, discuss what evidence, if any, Kastalon had produced to demonstrate that the loss of the rolls was not due to Kastalon's failure to exercise reasonable care. Rather, the court concluded—as it had in the context of the conversion claim—that the lapse of over thirty months without communication from Toll Processing, coupled with the fact that Kastalon was not a storage facility, proved that Kastalon had acted reasonably in disposing of the rolls. We disagree, and reverse the district court's grant of summary judgment in favor of Kastalon on the negligence claim. Given the sparse analysis of the bailment issue, we cannot conclude that the district court should have granted summary judgment in favor of Toll Processing on this claim.

**C. Breach of Contract**

The district court granted summary judgment in favor of Kastalon on Toll Processing's breach of contract claim,

because it found that the oral agreement between the parties did not have a specific duration, and lacked consideration.

Under Illinois law, oral agreements are enforceable "so long as there is an offer, an acceptance, and a meeting of the minds as to the terms of the agreement." *Bruzas v. Richardson*, 945 N.E.2d 1208, 1215 (Ill. App. Ct. 2011). To be enforceable, such an oral agreement must be sufficiently definite as to its material terms. *Wait v. First Midwest Bank/Danville*, 491 N.E.2d 795, 801 (Ill. App. Ct. 1986). The parties do not dispute that the duration of Kastalon's obligation to store the rolls was a material term of their agreement; their dispute relates to the length of the duration.

The district court found that there was no meeting of the minds as to how long Kastalon agreed to store the rolls. Toll Processing argued that Kastalon agreed to store the rolls until Toll Processing issued a purchase order for Kastalon to refurbish the rolls—whenever that might be. Kastalon confirmed that it had agreed to store the rolls until Toll Processing found a location for the pickle line and issued the purchase order for the refurbishment of the rolls, but insisted that this was to be for a short time—a period of three or four months. This discrepancy, the district court found, showed that the parties did not have a mutual understanding as to the duration of the storage agreement.

The district court also found that Kastalon received no consideration for assuming the risk that Toll Processing might never issue a purchase order, and concluded that this lack of consideration rendered the agreement illusory and unenforceable. Because "there was nothing to bind Toll Processing," the district court granted summary judgment in

Kastalon's favor as to Toll Processing's breach of contract claim. *Toll Processing Services, LLC,* 2015 WL 5179685, at *5.

On appeal, Toll Processing argues that "the parties' conduct established an agreement on the material terms, and the undisputed facts of record established that there was consideration to support the agreement." Appellant's Brief at 28. Toll Processing also argues that the district court erred because the duration of the contract either was tied to the reinstallation of the pickle line, or presented a genuine dispute of material fact regarding the parties' mutual intent.

Kastalon responded that Sander—Toll Processing's inside counsel—admitted that the parties did not reach an agreement that Kastalon was to hold the rolls indefinitely, and that he admitted that the alleged oral agreement placed no obligations on Toll Processing other than to advise Kastalon that it had received a purchase order for the pickle line and was ready to proceed with work involving the rolls. According to Kastalon, the spare and vague terms of this oral agreement were too indefinite to be enforced under Illinois law.

Kastalon's expectation that Toll Processing would hire it to repair and refurbish the rolls constitutes consideration. But we conclude that the district court correctly entered judgment in Kastalon's favor as to Toll Processing's breach of contract claim, because the evidence shows that the parties did not have a mutual understanding that Kastalon would store the rolls indefinitely.

The duration of the agreement was to be determined by the date on which Toll Processing issued a purchase order to Kastalon to repair and refurbish the rolls for use in the

newly installed pickle line.[4] When Kastalon agreed to store the rolls, however, Toll Processing did not know when—or even if—it would issue that purchase order. The parties hoped and anticipated that Toll Processing would issue the purchase order within months, but Toll Processing conceded that it was possible it might never have issued a purchase order. Even Sander agreed that it would not have been reasonable to expect Kastalon to store the rolls forever. And Schempp (the consultant on the pickle line project) could not explain what would have happened to Kastalon's obligation to store the rolls if Toll Processing never had issued a purchase order.

The district court correctly determined that the undisputed facts showed that the parties "perhaps … attempt[ed] to formulate a contract," but that they did not reach a mutual understanding that Kastalon would store the rolls for any certain period of time, let alone indefinitely. *Id.* Perhaps due to the parties' belief that the pickle line would be re-installed within a period of months, the storage agreement was not reduced to writing. Even though "the plaintiff might have been comfortable with proceeding somewhat informally in its dealings with defendant, it cannot later expect the court to complete the negotiation process and arrive at terms on its behalf." *Doyle's Const. & Remodeling, Inc. v. Wendy's Int'l, Inc.*, 144 F. Supp. 2d 969, 974 (N.D. Ill. 2001) (citing *J.F. McKinney*

---

[4] The Illinois Supreme Court has held that "the duration of an agreement may be determined from a consideration of the agreement as a whole," or can be "inferred based on custom in the area … ." *Wait*, 491 N.E.2d at 801 (citations omitted). The agreement here is too sparse for that remedy, and given the unique circumstances, there is no evidence in the record of "custom."

*& Assocs., Ltd. v. Gen. Elec. Inv. Corp.*, 183 F.3d 619, 622 (7th Cir. 1999)). We affirm the district court's grant of summary judgment in Kastalon's favor (and denial of summary judgment to Toll Processing) on Toll Processing's contract claim, because the parties' oral storage agreement was not sufficiently definite as to duration, a material term of the oral agreement.

### III. Conclusion

We reverse the district court's grant of summary judgment in favor of Kastalon on Toll Processing's conversion claim, reverse the grant of summary judgment in favor of Kastalon on the negligence claim, and affirm the district court's grant of summary judgment as to Toll Processing's breach of contract claim. We remand to the district court for further proceedings consistent with this decision.

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.